UNITED STATES of America

v.

**Steven MANN, Dennis McLaughlin, Marc Shulman, Bruce Cunningham.**

Crim. No. G–78–4.

United States District Court,
S. D. Texas,
Galveston Division.

Dec. 29, 1978.

---

8. Kuh, Book Review, 82 Harv.L.Rev. 497, 500 (1968).

Ronald G. Woods, Asst. U. S. Atty., Houston, Tex., for United States.

Dick DeGuerin, Houston, Tex., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

COWAN, District Judge.

*Introduction*

The defendants have been convicted for conspiring to import marijuana into the United States, conspiring to possess marijuana with intent to distribute in the United States, and carrying firearms during the commission of felony offenses.

Before trial, the court conducted a two and one-half day evidentiary hearing primarily for the purpose of determining the location of the defendants' vessel (the "TEXAS STAR") at the time of its seizure. The court has now concluded on the basis of an examination of the law, that this two and one-half day evidentiary hearing was probably unnecessary, and this opinion is prepared in part for the purpose of preventing future unnecessary expenditure of judicial time in similar cases.

The defendants, through counsel, have requested the court to make detailed findings of fact concerning the motion to sup-

press. This document will serve the purpose of making such detailed findings of fact.

*Findings of Fact Relating to Location of TEXAS STAR at Time of Seizure*

Defendant Mann contends, and testifies, that at the time of seizure his vessel was located approximately eight miles northeast of the tip of the Yucatan peninsula. The United States contends that the TEXAS STAR, at the time of the seizure, was approximately 30 to 34 miles northeast of the tip of the Yucatan peninsula. As indicated below, the court, after a review of the authorities, has determined that this factual dispute is, and at all material times has been, immaterial. In the event the court is mistaken, and in compliance with the request of counsel for defendants, the court will here make detailed findings of fact in this factual dispute.

The court finds as a fact that the TEXAS STAR, at all times during the seizure, was more than 12 miles from the coast of Mexico, for the following reasons:

1. The officers of the Coast Guard Cutter VALIANT (hereinafter "VALIANT") have testified that at all times during the seizure their vessel was between 30 and 34 miles from the coast of Mexico. The court accepts the credibility and reliability of these officers.

2. The detailed records of the VALIANT's navigational computations support the testimony of the officers. These records were made by various persons, at various times, working under pressure. The records are not complete. There are some omissions and irregularities in the records. These irregularities and omissions are not sufficient to make this court question the credibility and reliability of these records, and the records support the testimony of the officers of the VALIANT concerning its position.

3. The uncontradicted testimony of all witnesses, including that of the defendant Steven Mann, is to the effect that the light at Cabo Catoche was not visible at any time during the seizure. The testimony of some of the Coast Guard witnesses, whom this court credits, is to the effect that the light at Cabo Catoche can be seen for 12 miles at the time of day when the seizure occurred, and that this inability to see the light at Cabo Catoche establishes a distance of greater than 12 miles from the coast of Mexico. The only testimony offered by the defendants to support their contention that the TEXAS STAR was eight miles from the Mexican coast is the uncorroborated testimony of defendant Mann to the effect that he could see the coast of Mexico in his radar screen. There is credible testimony that if the coast of Mexico could be seen in the radar screen, the TEXAS STAR would have been closer than 12 miles to the Mexico coast. There are several difficulties with Mann's testimony. First, Mann admits that at the time of his alleged observation of the radar screen, he was engaged in the commission of a felony. He admits that the explanation which he gave to the boarding party concerning his cargo was false. His credibility is thus suspect. In addition, two members of the boarding party looked at the radar immediately after the boarding, observed the blip on the radar created by the VALIANT, but did not observe on the radar any indication of the Mexican coast. Mann's testimony, therefore, in addition to being uncorroborated is directly contradicted by the testimony of the members of the boarding party who looked at the radar.

4. The position of the TEXAS STAR during the boarding was checked by both loran and celestial sighting. While there is some dispute concerning the accuracy of the loran readings, the accuracy of the celestial fix taken at 6:45 p. m., during the course of the boarding, is undisputed.

5. Any discrepancies in the records of the VALIANT concerning the reading of the fathometer may raise certain suspicions, but do not rise to the level of proof, for the reason that the evidence demonstrates that the floor of the Gulf of Mexico in this area is not completely regular, and that contour lines drawn to connect points of established depth are approximations of the depth at a precise spot and not mathematically accurate.

6. It is inherently improbable that the defendants would have subjected themselves to capture by Mexican patrol boats. There is testimony that the waters in which they were sailing are heavily patroled by Mexican patrol boats.

7. After the seizure, at the time of the seizure, and during the fairly extensive conversations which occurred between the defendants and the crew of the VALIANT during the trip back to Galveston, there was no complaint or suggestion that the seizure had occurred within the contiguous zone of three to 12 miles off the Mexican coast. There was no complaint or question raised concerning the location or legality of the seizure at the time of the seizure.

8. The chart seized aboard the TEXAS STAR, while somewhat ambiguous and far from completely clear, would seem to indicate that the TEXAS STAR was following the same general route as that followed by Capt. Bowdin, one of the defendants' witnesses. If the TEXAS STAR was following the same general route as Capt. Bowdin, the TEXAS STAR would have been considerably more than 12 miles from the Mexican coast at the time of the seizure, and thus Capt. Bowdin's testimony, as the court views the matter, supports the government's position concerning the location of the vessel.

■ Prior to the boarding of the vessel, a Customs officer, Mr. Graham, suspected that the TEXAS STAR might well be engaged in the smuggling of narcotics. This was a well-founded suspicion. This court is aware that no "particularized suspicion" is necessary to justify a boarding under 14 U.S.C. § 89(a), but in this particular case grounds would exist, in the undersigned's view, for a "particularized suspicion." The vessel was not rigged for fishing. It was obviously not engaged in fishing. It was obviously not engaged in marine research. It was neither a cargo vessel nor a pleasure boat. The course of the vessel during the period when it was under observation by the VALIANT was such as to support an inference that the boat was proceeding from Columbia to the United States. Not many shrimping vessels are seen in these waters. Under this set of circumstances, it was not an unreasonable conclusion for anyone to reach that the vessel was engaged in the smuggling of narcotics.

After the boarding occurred, the boarding crew of the VALIANT was presented with documentation indicating that the TEXAS STAR had been examined previously and a deficiency, lack of a pollution placard in the engine room, had been noted. During the inspection to determine whether or not this noted deficiency had been corrected, the crew of the VALIANT noted a strong smell of marijuana and observed bags. Steven Mann stated that these bags contained bauxite, a manifest improbability in view of the appearance and odor of the bags.

■ The boarding of the TEXAS STAR was not a pretext but was the exercise of the Coast Guard's duty and responsibility as outlined in the statute codified at 14 U.S.C. § 89(a). Search of the vessel was not unduly intrusive, and the marijuana was in reality in plain view although stored beneath decks. The marijuana was in "plain view" for the reason that it was plainly visible during the conduct of the normal safety and documentation inspection, and because of the odor emitted by the 22,000 pounds of marijuana.

*Legal Conclusions*

 A review of the law reveals that the two and one-half day suppression hearing in this case was unnecessary and a substantial waste of court time, taxpayer dollars, and the dollars of whomever is financing the defense of this case. The Fifth Circuit, en banc, in the case of *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) explained succinctly in footnote 4 that the term "high seas" includes seas which lie seaward of the territorial sea and encompasses both the contiguous zone and the area beyond the contiguous zone. The Court of Appeals said:

This 12-mile limit includes the territorial sea, which extends to three miles from the coast, and the contiguous zone, which extends from three to 12 miles from the coast. The United States exercises plenary powers over the territorial sea, subject to the requirement that the passage of foreign vessels may not be interfered with unreasonably. *See* Carmichael, *At Sea with the Fourth Amendment*, 32 Miami L.Rev. 51, 56–57 (1977). The power of the United States over foreign vessels in the contiguous zone is limited to the preservation of specific interests, e. g., the enforcement of customs and safety laws. *See id.* at 58.

The high seas lie seaward of the territorial sea and thus encompass the contiguous zone. Although vessels on the high seas are subject to the powers exercised over the contiguous zones and certain safety, navigation, pollution, piracy, and slave-trade regulations, no country may assert sovereignty over the high seas. *See id.* . . . To maintain order on the high seas, therefore, each nation is charged with the duty of policing its own vessels. Convention on the High Seas, art. 10, 13 U.S.T. at 2316. It was in the performance of this duty, pursuant to the authority of § 89, that the Coast Guard boarded the *Stormy Seas* some 700 miles at sea.

The Convention on the High Seas, September 30, 1962, art. 10, says: .

The term "high seas" means all parts of the sea that are not included in the territorial sea or in the internal waters of the state. .

The statute codified at 14 U.S.C. § 89(a) (1976) clearly provides that the Coast Guard has authority to make inspections, searches and seizures ". . . upon the high seas and waters over which the United States has jurisdiction . . ."

Whether the TEXAS STAR was eight miles from the Mexican coast, or 30 miles from the Mexican coast, it was still on the high seas and the Coast Guard still had full authority to inspect the vessel, and, upon discovery of the marijuana, make a search, seizure and arrest.

In addition, there is another cogent reason why the detailed suppression hearing in this case was totally unnecessary. The purpose of the Fourth Amendment is to protect persons who have some reasonable expectation of privacy in the premises which they are occupying. It is manifestly absurd to contend that the defendants had a reasonable expectation of privacy if they were 11.9 miles from the Mexican, but no reasonable expectation of privacy if they were 12.1 miles from the Mexican coast.

 While no cases precisely in point have been discovered, it is elementary that a person with no expectation of privacy or interest in the premises may not complain of an illegal search. *See Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). Defendants had no reasonable expectation of privacy in Mexican waters, even if they had been in Mexican territorial waters. Defendants certainly had no "possessory interest" of any kind in Mexican contiguous waters or the Mexican territorial sea. It therefore appears to the court that under the doctrine followed in *Brown v. United States* and applied by the Fifth Circuit in the cases cited *infra*, defendants have no standing to complain of the search, seizure and arrest of the TEXAS STAR, even if they were located within the Mexican territorial sea and certainly when they were merely located within the Mexican contiguous waters by the testimony of their own witness, defendant Mann.

938

While no case directly in point has been located, this court believes that the finding of lack of standing to challenge the search, seizure and arrest of the vessel is supported by the philosophy of the following Fifth Circuit cases: *United States v. Dyar,* 574 F.2d 1385 (5th Cir. 1978); *United States v. Archbold-Newball,* 554 F.2d 665 (5th Cir. 1977); *United States v. Holmes,* 537 F.2d 227 (5th Cir. 1976); *United States v. Turk,* 526 F.2d 654 (5th Cir. 1976); *United States v. Hunt,* 505 F.2d 931 (5th Cir. 1974).

■ The basic principle as stated by the Supreme Court in *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969) is that the suppression of evidence based on the Fourth Amendment violation "can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing."

■ The defendant who seeks to suppress the evidence must establish that he was a victim of an invasion of his own privacy. *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1970).

Defendant Mann testified at length in support of his motion to suppress, and in support of his theory that he was within the contiguous zone of the Mexican waters. The United States, in recognition of the doctrine in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) did not attempt to introduce Mann's admissions during the suppression hearing at trial.

■ Defendants here were charged with a conspiracy to possess marijuana with intent to distribute within the United States, and a conspiracy to import marijuana into the United States. Possession of the seized item at the time of seizure was not an element of either crime, and thus defendants had no "constructive standing." See the reasoning of the Fifth Circuit in *United States v. Archboll-Newball, supra.*

For the reasons stated herein, defendants' motion to suppress was in all things overruled.