**UNITED STATES of America, Plaintiff,**

**v.**

**Clinton HAYES et al., Defendants.**

**Crim. No. 79–190.**

United States District Court,
D. Puerto Rico.

June 14, 1979.

Justo Arenas Fernandez, Asst. U. S. Atty., San Juan, P. R., for plaintiff.

Sheryl E. Reich, Law Offices of Michael Kennedy, New York City, Emilio Soler-Mari, Rio Piedras, P. R., for defendants.

## OPINION AND ORDER

TORRUELLA, District Judge.

On June 5, 1979 the CHARLES M, a shrimp boat of American registry and ownership, was intercepted on the high seas in the Carribean Sea, south of the Mona Passage by the United States Coast Guard Cutter GALLATIN. The point of interception was approximately 110 miles southeast of Cabo Rojo, Puerto Rico. The CHARLES M was heading in a northeast direction when first sighted. Upon questioning by voice radio the GALLATIN was informed that the CHARLES M's home port was Key West, Florida and that this would be the next port of call. She also stated that she carried no cargo, that she had not yet fished, but that she intended to do so "in the Islands". The Coast Guard had instructions to conduct inspections of all United States flag vessels on the high seas under 200 feet in length. Since the CHARLES M was flying the flag of the United States and otherwise fitted this description, a boarding party from the GALLATIN was dispatched to conduct a safety, documentation, and fishing regulations inspection. Once on board the vessel CHARLES M, members of the boarding party were informed by the ship's captain that the vessel carried no documentation. A cursory search for visible weapons and other persons, routinely carried out by the boarding party for its own safety, revealed the presence of bales of a green leafy substance in the pilot house, in the forward holds, and on the top deck, the latter being slightly covered with nets but plainly visible. A field test of the leafy substance showed a posi-tive reaction for marijuana. Approximately 13 tons of the substance were found aboard the vessel. Defendants were subsequently charged with violation of 21 U.S.C. Secs. 841(a)(1) (possession with intent to distribute); 952(a) (importation); 963 (attempt) and 18 U.S.C. Sec. 2 (aiding and abetting).

Defendants' initial motions to suppress the evidence and to dismiss the Indictment for lack of jurisdiction were denied after hearings held on August 7 and September 10, 1979. After a jury trial held on September 11–13, 1979, defendants were found guilty as charged. This matter is now before the Court on defendants' "Motion for a New Trial and/or to Arrest Judgment of Conviction". This motion raises issues that were earlier before the Court and several incidental to trial proceedings.

Defendants' Motion recites the following arguments in support of their request: (1) the validity of The Coast Guard's boarding and subsequent search and seizure; (2) whether persons aboard a commercial vessel of United States registry on the high seas are subject to the reach of the provisions of the "Comprehensive Drug Abuse Prevention and Control Act of 1970", see esp. 21 U.S.C. Section 801, et seq.; (3) the qualification of certain jurors; (4) the alleged prejudicial effect of excluding certain testimony; (5) whether the Court erred in its instructions to the jury on Count Two of the Indictment; (6) whether defendants' motion for judgment of acquittal should have been granted; and, (7) whether any prejudice was caused by certain references in the prosecutor's final argument. We shall examine each point separately.

### I. The Coast Guard's boarding and subsequent search and seizure

The present case is another in a series of cases in which the authority of, and the standard applied to, warrantless Coast Guard safety and documentation inspections has been challenged. Defendants' Motion to Suppress is premised on the belief that the boarding, and resulting search and seizure, are invalid because the Coast Guard

here had neither a search warrant nor probable cause to believe any crime was being committed, or any regulation was being violated at the time of the initial boarding of the CHARLES M.

▪ Fifth Circuit case law is dispositive in this matter.[1] In *United States v. Warren*, 578 F.2d 1058, 1064–65 (CA 5 1978) reh. en banc on other grounds, 586 F.2d 608 (CA 5 1978), it held:

> "Federal law authorizes the Coast Guard to make inquires, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. 14 U.S.C. Sec. 89(a) (1976). This law is constitutional *United States v. One 43 Foot Sailing Vessel*, 538 F.2d 694 (5th Cir. 1976), and pursuant to its authority, the Coast Guard may apprehend and board any vessel of the American flag. This authority is plenary when exercised beyond the twelve-mile limit; it need not be founded on any particularized suspicion. *United States v. Odom*, 526 F.2d 339, 341–42 (5th Cir. 1976); *United States v. One 43 Foot Sailing Vessel*, 405 F.Supp. 879, 882 (S.D.Fla.1975), aff'd. 538 F.2d 694 (5th Cir. 1976). The cases have recognized the power of the Coast Guard having boarded a vessel of the American flag, to conduct documentation and safety inspections. *United States v. Hillstrom*, 533 F.2d 209, 210 (5th Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 734,

50 L.Ed.2d 749 (1977); *Odom*, 526 F.2d at 342. If, during the course of such an inspection, circumstances arise that generate probable cause to believe that a violation of United States law has occurred, the Coast Guard may conduct searches, seize evidence, and make arrests. *Odom*, 526 F.2d at 342."

See also *United States v. Erwin*, 602 F.2d 1183 (CA 5 1979); *United States v. Conroy*, 589 F.2d 1258, 1265–1267 (CA 5 1979); *United States v. Cadena*, 588 F.2d 100–101 (CA 5 1979); *United States v. Freeman*, 579 F.2d 942, 946 (CA 5 1978).

We agree with the law as stated by *Warren*. See: *United States v. Keller*, 451 F.Supp. 631 (D.P.R.1978).[2] Defendants through argument adduced in the hearing on these motions raise the possibility that this holding has been eroded by two Supreme Court cases decided shortly before and after *Warren*. In the first of these, *Marshall v. Barlow's Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Supreme Court invalidated provisions of the Occupational Safety and Health Act of 1978 (OSHA) which allowed warrantless inspection of business premises for safety hazards and violations of OSHA regulations. In doing so the Court reasoned that the Fourth Amendment protects commercial buildings as well as private homes and that business enterprise in general is not subject to such a "long tradition of close government supervision" as to infer a consent to the search in question. *Id.* at p. 313, 98 S.Ct. at p. 1821.

In the second case, *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held invalid the police practice of stopping automobiles at random for a routine check of driver's licenses and vehicle registration. Here the Court drawing on the earlier cases of *United States v. Martínez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) and

---

1. The First Circuit has not specifically addressed this issue, but note *United States v. Miller*, 589 F.2d 1117, fn. 3 (CA 1 1978) and *United States v. Mehtala*, 578 F.2d 6, fn. 6 (CA 1 1978).

2. *Keller* was decided before the en banc opinion of the Fifth Circuit reported at 578 F.2d 1058, but after the panel decision reported at 550 F.2d 219. With respect to the particular issue presently before us both *Warren* opinions are similar.

*United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), found that these random isolated spot checks constituted such an intrusion of privacy that the harm caused outweighed the interest of the governmental aim. Defendants would have us transfer to the sea these land-based decisions and limit the authority of the Coast Guard documentation stop.

 It is, of course, quite clear that "[t]he basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). In assessing whether governmental action transgresses the limits of this Amendment we measure it against a standard of the "reasonableness" of the particular action in light of all the circumstances and facts present. See *Prouse* fn. 6. What is "reasonable" under the Fourth Amendment ". . . is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interest as well as the interests of individuals citizens." *Carroll v. United States,* 267 U.S. 132, 149, 45 S.Ct. 280, 284, 69 L.Ed. 543 (1925). It will also "depend upon the specific enforcement needs and privacy guarantees of each statute." *Barlow's Inc.,* supra, 436 U.S. at p. 321, 98 S.Ct. at p. 1825. In attempting to bring these broad principles to a specific workable test of Fourth Amendment validity the Court in *Prouse* stated:

"Thus, the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard', whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon some 'quantum of individualized suspicion', other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field . . .'" *Id.* pages 654–655, 99 S.Ct. pages 1396–1397. (citations and footnotes omitted).

Against this backdrop of Fourth Amendment principles we examine the issue presented by the facts of this case and the continued reliance of *Warren* as valid case law.

█ We assume that no party would quarrel with the legitimate concerns of a sovereign to regulate and control vessels that fly its flag on the high seas.[3] We further assume that no issue may be raised as to the power of the sovereign to protect its borders.[4] It is also unequivocally clear that those who go to the sea in ships must necessarily be aware and understand the "pervasiveness of regulation"[5] that traditionally surrounds the sea-goers. This is established not only by local and national statutes but also by international treaties and agreements and ancient customs and usages of the sea. "The remotest history of shipping furnishes abundant evidence of governmental concern." Gilmore & Black, *The Law of Admiralty,* p. 959. As part of this ancient right of regulation all nations have been allowed to, at a minimum, verify the right of a ship which claims authority to fly a particular flag to so fly that flag.[6] This is particularly true when the vessel

---

3. This authority is recognized under Article I, Section 8, Clause 3 of the Constitution.

4. See gen.: *Almeida-Sánchez v. United States,* 413 U.S. 266, 268–269, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

5. We borrow and modify this phrase from *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).

6. See *United States v. Postal,* 589 F.2d 862, 870–871 (CA 5 1979).

**908**

flies the same flag as the verifying authority.[7]

■ With all due respect to differing opinions[8] the stop or detention of a pedestrian or an automobile is not the land counterpart to a high seas documentation check. To so hold would be to negate the practices and usages to which seamen have been accustomed to since the earliest days of sea travel.[9] An ocean going ship is generally more mobile and evasive than an automobile and is not bound to finite routes.[10] The vastness of the sea makes permanent check points at places other than ports-of-call, in practical terms, useless. It is more difficult, if not at times impossible, to secure a warrant for the search of a vessel on the high seas. In a like manner, and without submerging ourselves with unnecessary detail, we can envision problems that may make the issuance of "area wide warrants", such as those suggested in *Camara v. Municipal Court,* supra, and by Justice Powell concurring in *Almeida-Sánchez v. United States,* 413 U.S. 266, 282–283, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1971), not feasible or in fact pertinent to the type of situation the Coast Guard documentation check is addressed to.

■ Moreover, balancing the interests involved, the expectations of privacy of the individual with the legitimate concerns of government,[11] we find little, if any, resulting intrusion on any individual right by virtue of the initial boarding here in question. Fourth Amendment case law has always recognized a difference between a private home and a car, or a boat. In the latter, courts have always recognized a "lesser expectation of privacy." See *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Miller,* supra. This is not to say a boat looses all expectations of privacy, particularly in areas such as the crews' quarters, or perhaps, when it is permanently moored as a house boat. See *Prouse,* supra; *Miller,* at fn. 3. But the "close regulation" surrounding seagoing vessels and all maritime endeavor is of such a nature that a mariner subjects himself to those customs and usages of the sea and comes to expect them as part of the normal course of events. See e. g. *United States v. Whitmire,* supra, at pgs. 1312–1313; *United States v. Freeman,* 579 F.2d 942 (CA 5 1978); *United States v. Keller,* supra, at fn. 17. We are not unmindful that other courts have not so seen the mariner. Cf. *United States v. Piner,* at p. 1339. But it is an inescapable fact that long before Government brought it upon itself to regulate firearms, *United States v. Biswell,* supra, and indeed with roots[12] that predate the origins of the liquor legislation outlined in *Colonnade Corp. v. United States,* 397 U.S. 72, 75, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), the authority of Government to enforce its documentation, navigational, and customs laws was well established. See gen. *Maul v. United States,* 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed.2d 1171 (1927) (J. Brandeis, concurring).

---

7. In the case of *fishing* vessels within the 200 mile economic zone established by Congress, 16 U.S.C. Sec. 1811, it is of added importance that the Coast Guard be allowed to verify the nationality of vessels within that zone, as well as to check the legality of their catch, fishing gear, and fishing license. 16 U.S.C. Sec. 1861, see esp. (b): "Any officer who is authorized . . . may (B) board, and search or inspect, any fishing vessel which is subject to the provisions of this Chapter; . . ."

8. *United States v. Piner,* 452 F.Supp. 1335 (N.D.Cal., 1978).

9. This is not to say that usage and custom alone would sanction a violation of the Constitution, cf. *Piner,* supra at fn. 6 and the dissent in *United States v. Whitmire,* 595 F.2d 1303, fn. 3 (CA 5 1979), but only that observance of these long-known and practiced customs sheds light on what was "reasonable" at the time of the enactment of the Fourth Amendment, see *Carroll,* supra, and what is reasonable at the present, *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977).

10. See *United States v. Miller,* supra, at p. 1125. We do well to emphasize that our analysis is strictly circumscribed to the facts before us: a commercial-looking vessel, of American registry, on the high seas. We leave open whether other types of craft at places other than on the high seas should obtain different treatment.

11. See *Prouse,* fn. 8.

12. Cf. Gilmore & Black, supra, § 11–4.

In balancing the interests involved, the nature of the stop itself is most relevant. Having recognized that seamen are fully aware of the likelihood of a documentation check we fail to see how a stop for such a purpose can be labeled an "intrusion" in the context of *Martínez-Fuerte,* 428 U.S. p. 558, 96 S.Ct. 3074, or as "unnecessarily frightening or offensive" as was the case in *United States v. Ortiz,* 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1974); or how it could be considered as provoking the "anxiety" that so troubled the Court in *Prouse.* The boarding itself is for a specific limited purpose. See *United States v. Cadena,* supra, fn. 2. Not unlike *Martínez-Fuerte* the documentation and safety check is only a "brief detention."[13] All that was required was that the ship's personnel present documents demonstrating that the particular ship had the right to the flag that it was flying and that it complied with the navigational safety laws which fall under Coast Guard jurisdiction, and in this particular case, the fishing laws of the United States. If this type of inspection was to have any effectiveness or meaning, it necessarily required a boarding of the vessel. We emphasize that this boarding was limited to inspection of documentation and safety compliance.[14] It is abundantly clear that any search beyond this is valid only upon consent or probable cause. *Martínez-Fuerte,* supra, 428 U.S. at p. 567, 96 S.Ct. 3074.

In the final analysis we concur in the observation by the Court in *Whitmire*: ". . . in the maritime context, the policies behind several traditional discrete exceptions to the warrant requirement—the border search doctrine, the administrative inspection exception for certain regulated industries, and the automobile-exigent circumstances doctrine—uniquely converge." *Id.* at fn. 36. Marshaling all the above factors together we have no difficulty in finding continuing validity to the *Warren* rule.

Once we have established that Coast Guard personnel had authority for the initial boarding, it follows that the sacks which admittedly were in "plain view"[15] on the deck of the ship could not be the subject of any great expectation of privacy. See *Whitmire,* supra. Moreover, this fact coupled with the showing that the ship carried no documentation, would create such probable cause as to allow the Coast Guard to more fully establish the contents of the sacks. See: *United States v. Warren,* supra; *United States v. Freeman,* supra; *United States v. Miller,* supra. The Motion to Suppress was, therefore, correctly denied.

II. *The interplay between Title 18 U.S.C. Section 7 and drug offenses under Title 21.*

The second argument raised by defendants is that this Court lacks jurisdiction over the crimes charged, in that the special maritime jurisdiction statute, 18 U.S.C. § 7, is limited by its terms to crimes specified in that Title.

Title 18, United States Code, Sections 7(1) and 9 read as follows:

---

13. What intrusion one may find is not, from the evidence before us, the product of "arbitrary discretion". The officials in the field had orders, see *ante,* p. 905, which under *Prouse,* supra, 440 U.S. p. 663, part VII, 99 S.Ct. 1391, and *Martínez-Fuerte,* 428 U.S. p. 566, 96 S.Ct. 3074, are valid.

14. Defendants argue that the Coast Guard's documentation was "pretext" and that the only aim in boarding was exclusively to search for contraband. However, having found that the documentation stop was routine and valid, and not having found that these officials intended to go beyond what we have found permissible, any claim of ulterior motives would not, of itself, vitiate an otherwise legal seizure. See: *South Dakota v. Opperman,* 428 U.S. 364, 376, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1975); *United States v. Warren,* 578 F.2d at p. 1073; *United States v. Hillstrom,* 533 F.2d 209 (CA 5 1976), cert. denied 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Mann,* 462 F.Supp. 933, 936 (S.D.Tex.1978); cf. also: *Amador-González v. United States,* 391 F.2d 308 (CA 5 1968).

15. See: *Coolidge v. New Hampshire,* 403 U.S. 443, 465–466, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

"§ 7. Special maritime and territorial jurisdiction of the United States defined:

The term "special maritime and territorial jurisdiction of the United States", *as used in this title,* includes (our emphasis)

(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States of any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State."

"§ 9. Vessel of the United States defined:

The term "vessel of the United States", *as used in this title,* means a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by or under the laws of the United States, or of any State, Territory, District or possession thereof." (our emphasis)

Unlike Title 21 United States, there is no statute in Title 18 United States Code which prescribes conduct relating to narcotics and dangerous drugs.[16] Defendants aver that the special maritime jurisdiction applies only to Title 18 United States Code offenses and that the Congress did not intend to make Title 21 offenses apply extra-territorially, except for Title 21 United States Code, Section 959 which on its face applies extraterritorially.[17]

■■■■ Section 959, however, was enacted to encompass acts committed in *foreign countries* obviously under the theory of protective jurisdiction. But cf. *United States v. King,* 552 F.2d 833, 851 (CA 9 1976). The inclusion of a jurisdictional paragraph in Title 21 United States Code Section 959, however, does not mean that all other related statutes apply only territorially.[18] See *United States v. Postal,* 589 F.2d 862, 865 (CA 5 1979); *United States v. Cadena,* 585 F.2d 1252, 1259 (CA 5 1978).

Notwithstanding the specific language of Title 21 United States Code Section 959, Congress did make certain findings and declarations in passing the "Comprehensive Drug Abuse Prevention and Control Act". Sections 801(3) in part and 801(7) of Title 21 United States Code read, thus:

"(3) A major portion of the traffic in controlled substances flows through interstate and foreign commerce."

"(7) The United States is a party to the Single Convention on Narcotic Drugs, 1961, and other international conventions designed to establish effective control over international and domestic traffic in controlled substances."

The Single Convention on Narcotics Drugs, 18 United States Treaties, pgs. 1498, *et seq.,* entered into force in the United States of America on June 24, 1967. Arti-

---

**16.** This is so because the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1243, repealed the Narcotic Control Act of 1956, 18 U.S.C. § 1401–1407, and thus in effect *substituted that legislation.*

**17.** "§ 959. Manufacture or distribution for purposes of unlawful importation.

It shall be unlawful for any person to manufacture or distribute a controlled substance in Schedule I or II—

(1) intending that such substance will be unlawfully imported into the United States; or

(2) knowing that such substance will be unlawfully imported into the United States.

This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States. Any person who violates this section shall be tried in the United States District Court at the point of entry where such person enters the United States, or in the United States District Court for the District of Columbia."

**18.** Cf. *Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911) wherein Justice Holmes states:

"Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of the harm as if he had been present at the effect, if the state should succeed in getting him within its power."

cles 33 and 36 of said Convention read as follows:

"Article 33 (Possession of drugs)

The Parties shall not permit the possession of drugs except under legal authority."

Article 16 reads in part:

*Penal provisions*

1. Subject to its constitutional limitations, each Party shall adopt such measures as will ensure that cultivation, production, manufacture, extraction, preparation, possession, sale, delivery on any terms whatsoever, brokerage, dispatch, dispatch in transit, transport, importation and exportation of drugs contrary to the provisions of this Convention, and any other action which in the opinion of such Party may be contrary to the provisions of this Convention, shall be punishable offenses when committed intentionally, and that serious offenses shall be liable to adequate punishment particularly by imprisonment or other penalties of deprivation of liberty.

2. Subject to the constitutional limitations of a Party, its legal system and domestic law,

(a)(i) Each of the offenses enumerated in paragraph 1, if committed in different countries, shall be considered as a distinct offense;

(ii) Intentional participation, conspiracy to commit and attempts to commit, any of such offenses, and preparatory acts and financial operations in connection with the offenses referred to in this article, shall be punishable offenses as provided in paragraph 1;

3. The provisions of this article shall be subject to the provisions of the criminal law of the Party concerned on questions of jurisdiction.

4. Nothing contained in this article shall affect the principle that the offenses to which it refers shall be defined, prosecuted and punished in conformity with the domestic law of a Party."

19. Note: Article I, Section 8, Clause 10 of the Constitution

"The Congress shall have power . . .

It is defendants' position that notwithstanding the clear authority of treaties, the Court should render to Title 18 United States Code, Section 7 an interpretation to which it is not entitled particularly after reviewing the specific intent of Congress in enacting Title 21 United States Code, Section 801, and ratifying treaties which embody, as they must, domestic law. See U.S. Constitution, Article 1, Section 8.

Section 7 of Title 18 is the embodiment of the principle of the law of the flag, recognized by the United States Supreme Court in *United States v. Flores*, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086 (1933) and *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). In *U. S. v. Flores*, supra, Justice Stone noted that the English courts have consistently held that criminal jurisdiction is not restricted to vessels within the navigable waters of the realm, but follows its ships upon the high seas.

"From the very organization of the government, and without intermission, Congress has . . . asserted the power, analogous to that exercised by English courts of admiralty, to punish crimes committed on vessels of the United States while on the high seas . ." *Id.* 289 U.S. at 151, 53 S.Ct. at 583.

 Criminal jurisdiction is generally based upon the territorial principle:

". . . [b]ut that principle has never been thought to be applicable to a merchant vessel which, for purposes of the jurisdiction of the courts of the sovereignty whose flags it flies to punish crimes committed upon it, *is deemed to be a part of the territory of that sovereignty*, and not to lose that character when in navigable waters within the territorial limits of another sovereignty." (emphasis supplied) (citations omitted). *Id.* at 155-6, 53 S.Ct. at 585.[19]

In what may be termed strong language, the *Flores* court concludes:

To define and punish Piracies and Felonies committed on the High Seas, and Offenses against the Law of Nations."

". . . it is the duty of the courts of the United States to apply to offenses committed by its citizens on vessels flying its flag, its own statutes, interpreted in the light of recognized principles of international law." Id. p. 159, 53 S.Ct. p. 586.

The strict territorial standard is inappropriate to an enterprise conducted under many territorial rules and under none. It requires modification by the more constant law of the flag (see *Lauritzen v. Larsen*, supra, 345 U.S. at 584, 73 S.Ct. 921), which law we recognize as a variation of the territorial principle of jurisdiction, i. e., a fiction is created whereby the ship is part of the territory whose flag it flies and whose protection it sails under. The iteration of the law of the flag herein is consistent with realistic statutory construction. Some offenses are such that to limit their locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute violated. Cf. *Rocha v. United States*, 288 F.2d 545 (CA 9 1961). In such cases, Congress has not thought it necessary to make specific provision in the law that the locus shall include the high seas and foreign countries, but allow it to be inferred from the nature of the offense. See *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922).

20. The fact that 18 U.S.C. §§ 7 and 9 define jurisdiction and vessel "as used in this title" does not preclude the use of said definitions in other titles where said terms may be used and may not be defined. There is nothing in principles of statutory interpretation which require or even suggest to the Court that the Congress could be macrocosmic in passing drug abuse laws and myopic in the wording of jurisdictional legislation.

21. *United States v. Keller*, supra.

22. *United States v. Williams*, 589 F.2d 210 (CA 5 1979), *United States v. Postal*, supra. ·

23. *A fortiori*, our interpretation of *U. S. v. Flores*, supra and other authority lead us to the conclusion reached today. Defendants have argued that the violation in *Flores* was a traditional common law offense while the violations of Title 21 are purely statutory. In our review of the law, however, and for purposes of our decision, we find this argued contrast to be a distinction without a difference. See also:

". . . [A] criminal statute dealing with acts that are directly injurious to the government, and are capable of perpetration without regard to particular locality is to be construed as applicable to citizens of the United States upon the high seas or in a foreign country, though there be no express declaration to that effect." *Skiriotes v. Florida*, 313 U.S. 69, 73–74, 61 S.Ct. 924, 928, 85 L.Ed. 1193 (1941), citing *Bowman*.

Were the court to determine that Congress meant to exclude the offenses for which defendants have been indicted, then it would have to ignore Title 21 United States Code, Section 801, Title 14 United States Code, Sections 2 and 89(a), the Convention on the High Seas, the Single Convention on Narcotic Drugs and the obvious intent of the Congress in ratifying said statutes and treaties,[20] not to mention case law in this District[21] but also in other Circuits.[22]

■ In view of the above, and based upon the principle of the law of the flag,[23] this Court finds that it was the intent of the Congress to interdict the very conduct allegedly undertaken by defendants and thus finds that the Court had jurisdiction under Title 21 United States Code, Sections 841(a)(1) and 952(a),[24] to try said defendants.[25]

*United States v. Winter*, 509 F.2d 975, fn. 26 (CA 5 1975), cert. den. 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1976); *Keller*, supra, at fn. 9.

24. Section 952 prohibits the importation of controlled substances into the United States. Because of the conduct proscribed in the statute this Court would have jurisdiction irrespective and independently of Section 7. See: *United States v. Bowman*, 260 U.S. at pgs. 98–99, 43 S.Ct. 39; *United States v. Vicars*, 467 F.2d 452 (CA 5 1972).

25. Defendants are also charged with violating 18 U.S.C. § 2 which is not a jurisdictional statute but which contains an essential element of the offenses, since a person cannot aid and abet himself in the commission of an offense. It might be ingenuous to suggest that 18 U.S.C. § 7 applies to 18 U.S.C. § 2 and thus resolve the matter before us. Such an inchoate conclusion, however, could hardly be sustained, except by simple statutory interpretation.

III. *The disqualification of certain jurors.*

Defendants have further moved for a new trial on the grounds that the jurors did not have a sufficient command of the English language to understand the evidence or the Court's instructions. To this effect defendants have accompanied three sworn statements attesting to conversations had by counsel for defendants with certain jurors after the verdict had been entered and the jurors discharged.

At the outset we note that the issues raised herein do not present problems of juror misconduct, see *United States v. Doe,* 513 F.2d 709 (CA 1 1975), but of different aspects of juror disqualification. The central thrust of Defendants' claims in this regard is their allegation that several jurors were not competent in the English language. Because of Puerto Rico's unique position within the federal judicial system (see *United States v. Ramos Colon,* 415 F.Supp. 459 (D.P.R.1976)), such claims are not new. See gen. *United States v. Cepeda Penes,* 577 F.2d 754 (CA 1 1978); *Thornburg v. United States,* 574 F.2d 33 (CA 1 1978); *United States v. Cortés,* 440 F.Supp. 689 (D.P.R.1977). Defense attorneys practicing before this Court have had notice to properly formulate *voir dire* interrogation and be on guard for language disqualification problems.[26] *Cepeda Penes,* supra, at p. 759. "[T]here is a 'strong policy' against impeachment of jury verdicts on the basis of 'afterthoughts' by disappointed litigants." *Id.* quoting *Thornburg, supra,* which in turn quotes *Peterman v. Indian Motorcycle Co.,* 216 F.2d 289, 293 (CA 1 1954).

The first of the affidavits filed by defendants refers to an alleged incident with juror number 2[27] during a polling of the jury. The affidavit alleges that this juror could not understand the question being asked of him. The excerpt of the official transcript of this part of the trial reads as follows:

"THE COURT: Thank you. Is there anything further at this time with the jury?

MR. KENNEDY: I would like them polled, Your Honor.

THE COURT: Poll the jury, please.

THE CLERK: Roberto Rivera, is this your verdict?

MR. RIVERA: Yes.

THE CLERK: Mr. Antonio Serrano Rivera, is this your verdict?

Inaudible

THE COURT: Would you speak louder, please.

MR. SERRANO: Yes.

THE CLERK: Luis Rivera Izquierdo, is this your verdict?

MR. RIVERA: Yes."

The above excerpt of the transcript of proceedings is devoid of any indicia of juror incompetency.

The second and third affidavits filed on behalf of defendants relate to conversations had with jurors directly after the jury was discharged. These state first, that certain jurors required translation in order to understand the conversation and second, that when queried whether they believed defendants' boat was going to the United States they allegedly replied no or that it was headed somewhere else "in the islands."

The affidavits presented by defendants fall short on two accounts. First, the simple fact that they state that certain jurors preferred to respond in Spanish to questions posed in English does not, in and of itself, rebut the qualifications of these jurors as determined by the juror qualification forms and trial judge questioning pursuant to the local plan for selection of jurors. Cf. *United States v. Cortés, supra.* The juror qualification form and individual

26. We note retained counsel were joined by local counsel who is fluent in the Spanish language.

27. The affidavit makes reference to a " . . . Juror # 2, Mr. Arivera". No such name appears on the jury. There were, however: Roberto A. Rivera (Juror # 1), Antero Serrano Rivera (Juror # 2), and Luis G. Rivera (Juror # 3).

oral interrogatory by a district judge demonstrate sufficient proficiency to be a juror within the meaning of 28 U.S.C. § 1865. As mentioned, and as was the case here, jury *voir dire* is another step wherein juror competency may be tested. The petit jury impaneled in this action had satisfactorily passed muster at all these levels. During *voir dire* all jurors were individually tested for language competency, both orally and by written questions which they were required to answer. Counsel (with local counsel present) were given an opportunity to hear the answers of the jurors and to challenge any doubtful member or to propose further inquiry into their qualifications. During trial no incident occurred or was any expression made on the part of the jurors that put in question the ability of any of them to understand the proceedings.

"[I]t is well settled that only clear evidence of a juror's incompetence to understand the issues and to deliberate at the time of his service requires setting aside a verdict. And only strong evidence that it is likely that the juror suffered from such incompetence during jury service will justify an inquiry into whether such incompetence in fact did exist." *United States v. Dioguardi,* 492 F.2d 70, 78 (CA 2 1973) cert. den. 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); cited in *United States v. Gaudino Vargas,* 606 F.2d 341 (CA 1 1979).

The affidavits show no substantial failure to comply with the provisions of the Jury Selection Act, 28 U.S.C. §§ 1861–1871, or that defendants were tried by jurors unable to comprehend the proceedings.

Attributing full weight to the substantive portion of the affidavits filed by defendants we find they deal not with any extraneous matter or improper influence reaching the jury, but with the jury's perception of the evidence, *viz.,* the weight given to it and the conclusions to be drawn therefrom. Viewed from a different perspective the question of where defendants' boat was headed deals exclusively with the subjective mental thought process of the individual jurors. Nothing in the affidavits purports to show that the jurors were influenced by anything other than what transpired at trial.

Well settled, and indeed long established, legal principles prohibit the impeachment of a jury's verdict by eliciting and second guessing the mental process by which they, individually and collectively, reached their verdict. See: Rule 606(b), Fed.R.Evid.; *Stein v. New York,* 346 U.S. 156, 178, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); *McDonald v. Pless,* 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Hyde v. United States,* 225 U.S. 347, 383–384, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *United States v. Gerardi,* 586 F.2d 896 (CA 1 1978); *Smith v. Brewer,* 444 F.Supp. 482 (S.D.Iowa 1978). Insofar as the inquiries raised by defendants go to the very heart of what facts induced them to decide how they did, cf. *Rotondo v. Isthmian Steamship Co.,* 243 F.2d 581 (CA 2 1957), we find no way that the proscription of these rules may be circumvented in entertaining defendants' requested relief.[28] What the reasoned motivation for the verdict was, we will never know, (See: *United States v. Gaudino Vargas,* supra, p. 346) nor is it a proper subject of judicial inquiry.

IV. *Alleged error in excluding testimony as to the destination of the ship.*

As further grounds for vacating judgment and setting a new trial defendants aver that the Court erred to their prejudice by not allowing defendant Hayes to testify concerning "the ultimate destination of the marijuana". Defendants' motion of September 20, 1979, par. 4.

The record reveals that at one point during direct examination of this witness the following occurred:

"MR. KENNEDY: What was the ultimate destination of the mother ship?

---

**28.** Moreover, insofar as part of defendants' arguments in this regard are related to the sufficiency of the evidence, see: part VI, infra.

MR. QUILES: Objection.

THE COURT: Sustained. The answer is stricken from the record."

Trial Excerpt, September 12, 1979, p. 36.

Shortly thereafter the following colloquy took place:

"MR. KENNEDY: Do you know in your own mind where the marijuana was going ultimately?

A. Yes, sir.

Q. Where.

A. To Europe.

MR. QUILES: If that's because he was told then we have objection to his answer.

[after argument related to the question]

THE COURT: Motion is granted. The answer to the destination of the marijuana from information that he received is stricken from the record as being hearsay and is not appropriate evidence and should not be considered in any way by the jury." Trial Excerpt, September 12, 1979, pgs. 36–37.

Again, much later in the direct testimony:

"MR. KENNEDY: During the course of any of your conversations with any of the defendants did you discuss where, or say to them where the mother ship was going?

A. They said to Europe.

Q. When did you have these conversations with these defendants?

MR. QUILES: Objection. Calling for hearsay.

. . . . .

THE COURT: Objection sustained. The answer is stricken."

Trial Excerpt, September 12, 1979, p. 59.

It is clear that the statements intended to be introduced by defendant were not "one(s) made by the declarant while testifying at the trial or hearing, [but were] offered in evidence to prove the truth of the matter asserted." Rule 801(c), Fed.R.Evid. In that defendant did not argue at trial, and does not argue now, that these statements fall under one of the exceptions to the hearsay rule, Rules 803–806, they are not admissible. Rule 804. But assuming,

*arguendo,* that the statements were relevant under Rule 402 and conceding that they enhance defendants' theory of defense we still find no prejudice by this exclusion that would compel a new trial. While defendants argue that they were denied an opportunity to present their case to the jury the record shows otherwise.

Defendant Hayes stated the theory of defense at. the outset of his testimony. Page seven of the Excerpt reveals the following:

"MR. KENNEDY: . . . And what, sir, was it your intention to do upon your arrival with this cargo of marijuana and these. other three gentlemen whom you have identified here in Court, upon your arrival at the Saba bank area of E–1?

A. To off-load the marijuana on a mother ship and to receive supplies and other provisions to fish our way back home to Key West."

Further, early in the direct testimony defendant had ample opportunity to buttress his theory of defense by lengthy references to the proposition of a Mr. Cruz and defendants' initial rejection of his proposition. Trial Excerpt, pps. 17–21. Defendant further amply elaborated on his non-intention to introduce marijuana into the United States through his testimony of conversations with co-defendant Swope and the ultimate acceptance of the proposition of Mr. Cruz. Trial Excerpt, pps. 22–25.

Moreover, the record further reflects that after every instance where defendant's testimony was held inadmissible he did nevertheless deny that the marijuana was headed for the United States. Immediately following the cited references where testimony was denied the following occurred:

"MR. KENNEDY: Did anyone at any time tell you—don't tell us what they said—did anyone at any time tell you the ultimate destination of the marijuana?

A. Yes, sir.

Q. Who told you that?

A. Mr. Cruz.

Q. When?

A. When I first told him that I would do it. When we discussed the possibility of me doing it.

Q. And did you, sir, at any time intend to bring marijuana into the United States?

A. No, sir.

Q. Did you, sir, at any time intend to distribute or give that marijuana intending to bring it into the United States?

A. No, sir."

Trial Excerpt, p. 38.

This again happened after further hearsay testimony was found inadmissible:

"MR. KENNEDY: Did you, sir, intend to at any time break the laws of the United States of America with reference to your transportation of marijuana from Santa Marta to the mother ship at the Saba bank?

A. No, sir.

MR. QUILES: Objection.

THE COURT: Overruled.

MR. KENNEDY: And would you, sir, have transported this marijuana from Santa Marta to the Saba Bank if you thought that this marijuana would even be introduced into the United States of America?

A. No, sir." Trial Excerpt, p. 61.

 To require a new trial the error, if any, must be prejudicial and affect the substantial rights of the defendant. Cf. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). From the above it is evident that the defendants did present, and elaborate on, their theory of defense.[29] There is no right to present or elaborate on a defense theory through the use of inadmissible evidence. Even assuming error, the denial of these statements into evidence was clearly harmless. See gen. Rule 52(a), Fed.R.Crim.P.

V. *Error in the Jury Instructions.*

As a variation to arguments raised in part II of this opinion defendants challenge as erroneous the Court's refusal to instruct the jury that a sub-element of specific intent required under § 841 is that the distribution be intended within the United States.

Defendants' proposed instruction with respect to Count 2 read:

"It is not sufficient to find merely that the substance was marijuana, nor is it sufficient to find merely that the defendants possessed the marijuana, nor is it sufficient to merely find that the defendants possessed the marijuana with intent to distribute it in general. In order to convict the defendants of Count II, you must find that the defendants possessed the marijuana with the specific intention of distributing *it in the United States.*" (Emphasis supplied)

This proposed instruction was modified to conform with the standard instruction on possession with intent to distribute found in Devitt & Blackmar, *Federal Jury Practice and Instructions,* (3rd. ed.) §§ 58.09, 58.10 and 58.14.

 "It is settled law that a trial judge is under no obligation to deliver a requested instruction verbatim." *United States v. Irwin*, 593 F.2d 138, 140 (CA 1 1979). Neither the statute under which defendants were charged, the model instructions in Devitt & Blackmar, nor any case law to which defendants have cited or that we have been able to locate, set out as an element, or sub-element, the necessity that the distribution be within the United States so as to require this determination to go to the jury. This is so because the matter is one of jurisdiction. We have found in part II of this opinion that jurisdiction lies to try a § 841(a) violation against a person apprehended on the high seas aboard an American registered commercial vessel. Having so found, the question of the location of the point of *distribution* is immaterial and not an element to be proved. Strictly construing our holding in part II herein,

---

**29.** As a whole the record is replete with defendant's references to the effect that the cargo was not intended for the United States, see Trial

Excerpt pps.: 7, 20, 22, 23, 25, 26, 28, 33, 38, 49, 50 and 60–61.

the defendants were within American jurisdiction.[30] Particularly when we consider the treaties previously cited in this opinion, it is no less a violation of 21 U.S.C. § 841(a) to have possession of a prescribed substance with the intent to distribute in a foreign country, while aboard an American flag vessel on the high seas, than it is while standing on dry American territory. In our view it is the intent to distribute that is controlling, not where it is to take place. Defendants' energies would have been better directed at seeking an instruction that outlined their theory not one that altered the elements of a criminal statute. Cf. *United States v. Irwin,* supra. See: Rule 30, Fed.R.Crim.P.

Defendants in their arguments rely heavily on a statement found in *United States v. Warren,* 578 F.2d, at fn. 2.[31] The defendants were charged and convicted[32] in *Warren* with conspiracy under 21 U.S.C. § 963, a section which makes it unlawful to attempt or conspire to commit any other offense under the criminal control subchapter of Title 21. The *Warren* count was not faced with the specific issue before us now. The dictum reference to possession arose only as a commentary to an agent's suspicion on searching a cabin in defendant's boat. No other discussion of an extraterritorial or special maritime application of Title 21 offenses is had in the opinion. No mention is made of the Congressional findings of § 801 of Title 21 or of any case law dealing with the extraterritorial application of criminal statutes.[33] Thus, these remarks, made in passing, do not control the issue before us.

**VI.** *Whether defendants' motions for judgment on acquittal should have been granted.*

The next point raised by defendants' motion for a new trial concerns the Court's denial of defendants' motion for a Judgment of acquittal, both at the end of the government's case and at the end of defendants' case. In both instances the issue raised is the same: did the government prove the required intent which is an element under both offenses charged.

The standard applicable to determinations on this type of motion is well summarized in *United States v. Davis,* 183 U.S. App.D.C. 162, 562 F.2d 681 (CADC 1977) wherein the Court stated:

"In passing upon a motion for judgment of acquittal the trial court must view the evidence in the light most favorable to the Government giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact. It is only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury. In applying this standard no legal distinction is made between circumstantial and direct evidence. The Court must, however, consider only the evidence as it was when the Government rested." *Id.* 183 U.S. App.D.C. 164–165, 562 F.2d 683–684 (citations omitted).

See also: *United States v. Oliver,* 570 F.2d 397 (CA 1 1978); *United States v. Kilcullen,* 546 F.2d 435 (CA 1 1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582

---

**30.** Our ruling is of course limited to its facts. The question of whether Title 21 offenses committed on ships of non-American registry is not before us.

**31.** This note reads in part:
"We must point out that the mere possession of a controlled substance beyond the territorial limits of the United States (three miles from the coast) is not illegal. Therefore, although the small amount of marijuana 'aroused [Agent Wallace's] suspicion somewhat' its possession did not constitute an offense."

Though not completely in agreement, we would understand an argument that simple possession might not be that type of "[act] intended to produce and producing detrimental effects" within the United States, see note 18. We could not accept that argument under either § 952 (importation) or § 841(a) (possession with intent to distribute).

**32.** A conviction which the Fifth Circuit affirmed *en banc.*

**33.** See cases cited in part II of this opinion.

918

(1977); *Villarreal Corro v. United States,* 516 F.2d 137 (CA 1 1975).

 Intent is an element of both charges under the indictment. This element, however, like other elements of these crimes may be proved and established by circumstantial evidence.

"The prosecution may prove its case by circumstantial evidence, and it need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt. *United States v. Concepcion Cueto,* 515 F.2d 160, 162 (1st Cir., 1975); *United States v. Currier,* 454 F.2d 835, 838 (1st Cir., 1972); *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir., 1964). See also *Parker v. United States,* 378 F.2d 641, 644–45 (1st Cir., 1967). The trier of fact is free to choose among various reasonable constructions of the evidence. *United States v. Klein,* 522 F.2d 296, 302 (1st Cir., 1975)." Cited in: *United States v. Brown,* 603 F.2d 1022, 1024 (CA 1 1979).

 The evidence before the Court at the end of the Government's case had established that: the four defendants were arrested aboard a commercial ship with 13 tons of marijuana; the ship was approximately 110 miles South East of Puerto Rico; the boat was an American registered fishing vessel; all defendants were of American nationality; the boat had left the United States mainland and was admittedly headed for the United States mainland, at least as its final destination. Upon these facts reasonable men might infer that both an attempt to import a controlled substance and possession with intent to distribute, with requisite intent under both, had been established. Cf. *United States v. Conroy,* supra, pps. 1270–71. Further, "(i)t is well established, that intent to distribute may in proper circumstances be inferred from the amount seized." *United States v. Edwards,* 602 F.2d 458, 470 (CA 1 1979) *citing, United States v. Ramirez-Rodriquez,* 552 F.2d 883 (CA 9 1977).

Having found that defendants were not entitled to judgment of acquittal at the end

of the Government's case we must, *a fortiori,* make a like ruling with respect to the second motion. Looking at defendant Hayes' testimony in the "light most favorable to the Government" it is clear that the Government's case was strengthened and not weakened. In addition to the above listed factors this testimony revealed: the contract source to be definitely in the United States; and payment received in the United States in American currency. It is readily consistent to understand the jury as rejecting defendants' theory of defense; other than defendant Hayes' conclusory statements with respect to a mother ship, which Hayes could not describe, no other evidence was offered in this respect. Moreover, the map showing the true course of the CHARLES M was admittedly thrown overboard after contact with the Coast Guard. Hayes' credibility could also have been shaken with respect to his story of why they were off course or how they could state they were to fish for shrimp in waters not known for shrimp fishing.

The defendants were not entitled to Judgement of acquittal.

VII. *Erroneous summation by the prosecutor.*

Defendants' last contention in their motion for a new trial is an alleged prejudicial summation by the prosecutor. Specifically, defendants aver that the prosecutor's references to the destination of the ship and his statement that the "CHARLES M was for all purposes the equivalent of a piece of the United States" were prejudicial so as to require a new trial.

 It is true that a prosecutor's misconduct or error in his trial summation may compel a reversal of a conviction, or, as is the case here, a new trial. See e. g.: *United States v. Gonzalez Vargas,* 558 F.2d 631 (CA 1 1977). It is equally true, however, that not all error, misconduct, or misstatement necessarily rises to the level of requiring such a sanction. See e. g.: *United States v. Canas,* 595 F.2d 73 (CA 1 1979). Before a new trial will be required the misconduct, misstatement, or error on the

part of the prosecutor must be one that so prejudiced the defendant as to have denied him a fair trial. Cf. *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 93 (1969). "Trials are rarely, if ever, perfect . .." *United States v. Leftwich,* 461 F.2d 586, 590 (CA 3 1972), cert. denied 409 U.S. 915, 93 S.Ct. 247, 34 L.Ed.2d 178 (1974). "Counsel are necessarily permitted a degree of latitude in the presentation of their closing summations". *United States v. Rich,* 580 F.2d 929, 936, (CA 9 1978). Thus, it has been repeatedly stated:

> "Improprieties in counsels' arguments to the jury do not require a new trial unless they are so gross as probably to prejudice the defendant, and the prejudice has not been neutralized by the trial judge." *United States v. Parker,* 549 F.2d 1217, 1222 (CA 9 1977) cert. denied 430 U.S. 971, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977).

See also: *United States v. Jones,* 592 F.2d 1038 (CA 9 1979); *United States v. Rich,* supra; *United States v. Homer,* 545 F.2d 864, 867, 868 (CA 3 1976).

▆▆▆ Whether a prosecutor's closing summation which makes reference to the law applicable to a case is error is, in general terms, an issue of varied argument. Note: Annotation, 67 A.L.R.2d 245 par. III. Because it is the Court's function and duty to instruct the jury on the controlling law the better practice would, of course, be that any arguments of this type be limited solely toward demonstrating how the evidence, or reasonable inferences therefrom, conform to the law. However, irrespective of whether or not the prosecutor's summation here limited itself to alleging that the controlling law was satisfied by the evidence presented, the situation must still be measured against the standard of prejudice outlined above.

▆▆▆ Examining the prosecutor's closing summation it perhaps would have been preferable if the prosecutor had not headed in this direction and instructed the jury on the law or referred to points that were solely jurisdictional, and thus questions for the Court and not the jury. But these remarks were brief and were not inconsistent with our previous holding. The prosecutor's summation did not detract or mislead from what in fact was the applicable law. The alleged prejudice was totally irrelevant to one count of the indictment. In the first count the jury was instructed that importation meant bringing a controlled substance into the United States from any place outside thereof. We do not find substantial prejudice with respect to the second count (possession with intent to distribute). Among other things, see part VI, the national registry and the citizenship of the defendants were part of the evidence. As such the prosecutor could argue reasonable inferences to be drawn from this. See: *United States v. Marques,* 600 F.2d 742, 749 (CA 9 1979). As a whole the evidence supports an inference of a specific intent to distribute; see again part VI herein. Insofar as the specific intent element is the one most affected by the prosecutor's remarks, they are harmless.

For all the above cited reasons defendants' motion for a new trial or arrest of judgment is DENIED. Parts I and II shall be further understood to be this Court's formal opinion as to our earlier rulings on defendants' motion to suppress and motion to dismiss.

IT IS SO ORDERED.