UNITED STATES of America, Appellee,

v.

Michael Joseph ARRA, Steven Scott Aschinger, and Overton Baker Pettit, Defendants, Appellants.

No. 78–1361.

United States Court of Appeals, First Circuit.

Argued April 9, 1980.

Decided Aug. 21, 1980.

Ralph Vallone, Jr., Hato Rey, P.R., for defendants, appellants, Michael Joseph Arra and Overton Baker Pettit.

Selig I. Goldin, Gainesville, Fla., with whom Goldin & Cates, Gainesville, Fla., was on brief, for defendant, appellant Steven Scott Aschinger.

Mervyn Hamburg, Atty., U. S. Dept. of Justice, Washington, D.C., with whom Raymond Acosta, U. S. Atty., San Juan, P.R., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and LOUGHLIN,* District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Co–defendant Keller and defendants–appellants Arra, Aschinger, and Pettit were convicted of conspiracy to import 13,303 pounds of marijuana into the United States, possession of said marijuana with intent to distribute it in the United States, and at-tempted importation of the marijuana in violation of 21 U.S.C. §§ 841(a)(1), 963. The marijuana was discovered by the Coast Guard during the course of an administrative document and safety inspection which took place on the high seas approximately 35 miles north of Punta Borinquen, Puerto Rico at 10:30 p. m. The alleged illegality of this search is one of defendants' contentions on appeal. They also argue that the district court had no jurisdiction over the offenses charged and that the government's destruction of certain evidence prejudiced their ability to defend.

## I.  BACKGROUND

At approximately 2:00 p. m. on January 5, 1978, a Coast Guard helicopter on routine patrol sighted a yacht, the Great Mystery, located 15 miles north of Arecibo, Puerto Rico, and traveling in a northwesterly direction. As the Great Mystery was on a list compiled weekly by the Coast Guard of vessels suspected of violating United States laws, the helicopter reported the sighting by radio to Lt. Rummel, controller duty officer, stationed at the Coast Guard operations and rescue coordination center in Old San Juan. Lt. Rummel in turn contacted the Coast Guard 7th District operations center in Miami. Miami informed Lt. Rummel that the Great Mystery was suspected of importing marijuana to the east coast of the United States or Florida and ordered that a cutter be dispatched to investigate and that covert helicopter surveillance be maintained until the cutter arrived. The Coast Guard cutter Point Warde, which a few hours earlier had put in to San Juan for minor repairs to her electronic gear, was promptly dispatched with a crew of eight at 2:30 p. m. The Point Warde's initial orders were to conduct a boarding upon meeting up with the Great Mystery. This order was rescinded when it was determined, through the computer in Miami, that the Great Mystery, which displayed Florida registration numbers on its side, was owned by a Grand

* Of the District of New Hampshire, sitting by designation.

Cayman corporation. While the Coast Guard does board vessels owned by foreign corporations if the vessel is of domestic registry, there was a possibility that the Great Mystery could also have been registered in Grand Cayman, in which case, Lt. Rummel stated the Coast Guard would have maintained surveillance rather than have conducted a boarding.[1] The Point Warde was instead directed to inquire of the Great Mystery its nationality, that is, its registry, as well as its last port of call and next port of call.

At approximately 10:05 p. m. the Point Warde hailed the Great Mystery by radio and requested the above information.[2] Three witnesses testified to the response, giving varying accounts. According to Lt. Rummel, who was monitoring the transmission, a person who was not the captain answered the hailing and responded that the Great Mystery was a United States vessel en route from Curacao to Florida; the captain then came on and said they were a United States vessel on a pleasure trip from Curacao to Fort Lauderdale, Florida and were carrying no cargo. According to Lt. Luppert, who commanded the Point Warde, the first response was "We are from America, we are American." The captain then, in answer to a question concerning the nationality of the vessel, stated "Americans from Florida" and indicated the next intended port of call would be Fort Everglades, Florida. The captain in responding, had also given the Great Mystery's radio call sign which began with either a W or a K indicating, according to Commander Luppert's testimony, that the Great Mystery was a United States vessel. In contrast to the government's testimony, defendant Pettit, who testified he answered the original hailing, stated the Coast Guard asked not the nationality of the vessel but the crew's citizenship and Capt. Keller informed them they were United States citizens, that they had originally left from Fort Everglades, that their last port of call had been Curacao, and that they were headed for Nassau.

Commander Luppert was able to observe the Florida registration numbers on the Great Mystery and also noticed there was no hailing port printed under the name "Great Mystery" on the stern. This absence was somewhat unusual in Commander Luppert's experience. The paint on the stern appeared fresher than that on the rest of the boat, and he concluded the hailing port had been recently painted over.

Miami was informed of the Great Mystery's response, and an administrative document and safety inspection was ordered. The sea was rough that night, delaying the dispatch of the small boat and making the boarding more difficult. A four–member armed boarding party was dispatched from the Point Warde, three of whom boarded the Great Mystery, while a fourth, armed with a rifle, remained in the small boat. One of the three boarders, Seaman Arce, carried a loaded shotgun, and the other two had handguns. Seaman Arce stood guard

1. A vessel registered in more than one country is assimilated to a ship without a nationality and is not afforded protection under international law. *United States v. Cortes*, 588 F.2d 106 (5th Cir. 1979); Convention on the High Seas, Sept. 30, 1962, art. 6, 13 U.S.T. 2312, 2315, T.I.A.S. No. 5200. While it has recently been held that the Coast Guard properly may board a stateless vessel, *United States v. Cortes, supra; United States v. Dominguez*, 604 F.2d 304, 308 (4th Cir. 1979), *cert. denied*, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644, it may not have been the practice of the Coast Guard to do so at this time. In any event, no evidence was ever presented in the present proceeding that the Great Mystery was registered other than in Florida.

2. The communications between the Great Mystery and the Point Warde, as well as the conversations between Lt. Rummel and the Miami operations center and the later transmissions from the Point Warde to the boarding party, were recorded automatically at the operations and rescue center in San Juan. It is the destruction of these recordings which defendants argue prejudiced their ability to defend. *See* Part IV, *infra*.

over the crew—defendants Arra, Aschinger, and Pettit—during the course of the document and safety inspection.

Petty Officer Johnson, the head of the boarding party, asked Capt. Keller for the vessel's papers and the crew for identification. Passports and a birth certificate were produced, and the captain exhibited a card evidencing the Great Mystery's Florida registration. With the registration and some additional data supplied by a Lloyd's registry volume, Petty Officer Johnson was able to fill in the vessel description and ownership information required by form CP–4100, the Coast Guard's standard boarding report.[3] Apparently satisfied with the vessel's documentation, Petty Officer Johnson then asked to see the safety equipment. When he entered a compartment via the forward hatch to check for an accumulation of oil—a procedure Petty Officer Johnson said he ordinarily followed in conducting administrative inspections—he observed that the compartment was half filled with dog food bags containing a green leafy substance. A sample was sent back to the Point Warde where it tested positive for marijuana. The captain and the crew were then arrested and given their *Miranda* warnings, and the vessel was seized.

The primary duties of the Point Warde are search and rescue and maritime law enforcement. In the latter capacity, according to government witnesses, routine administrative inspections had been frequently conducted on vessels in the waters around Puerto Rico. Lt. Luppert, commander of the Point Warde, described the standard inspection procedure as follows:

> "We look for correct papers and documentation. We look for possible safety violations and we also check for firearms and check the cargo and make sure that the vessel is in compliance with its papers and if there are contraband substances."

The boarding party routinely carries weapons because, according to Commander Luppert, the Coast Guard has lately encountered a number of vessels, particularly in the waters around Puerto Rico and Florida, carrying contraband substances and protection is needed when dealing with a criminal element. Petty Officer Johnson testified, in the same vein, that arms were deployed because they were boarding a suspect vessel at night.

Petty Officer Johnson acknowledged that while the Point Warde would not have left San Juan on a special mission to check the Great Mystery had the latter not been on the suspect list, the administrative inspection conducted did not differ from that which routinely takes place on non–suspect vessels. Although Petty Officer Johnson had conducted approximately 100 inspections in the year and a half he had been stationed in Puerto Rico, he said the Great Mystery was the first suspect vessel he had encountered.

With this background, we turn to defendants various contentions.

## II. *JURISDICTION OVER THE OFFENSES*

Defendants argue that because the alleged crimes were not committed within the special maritime and territorial jurisdiction of the United States as defined in 18 U.S.C. § 7, the district court had no jurisdiction. Section 7 of title 18 provides in part as follows:

> "The term 'special maritime and territorial jurisdiction of the United States', *as used in this title* includes:
>
> (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or

---

**3.** The boarding form is set out at note 10 *infra*. The Great Mystery is described therein as a 71 foot long steel Swedish built vessel, constructed in 1938.

any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State." (Emphasis added.)

Defendants argue that because the Great Mystery did not belong "in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States" but rather was owned by a Grand Cayman corporation, the Great Mystery was not within the special maritime and territorial jurisdiction of the United States and therefore the court lacked jurisdiction. The district court concluded that, despite the Florida registration form which described the vessel as being owned by a Grand Cayman corporation, the vessel belonged in whole or in part to citizens of the United States. *United States v. Keller*, 451 F.Supp. 631, 636 (D.P.R.1978).

■ We need not decide whether the court's findings are clearly erroneous because 18 U.S.C. § 7 is not applicable. Title 18 sets forth a number of acts which, when committed within the special maritime and territorial jurisdiction, are federal offenses. *See*, for example, 18 U.S.C. § 81 (arson), § 113 (assault),[4] § 114 (maiming), § 1111(b) (murder). Section 7 of title 18 defines the term special maritime and territorial jurisdiction for the purpose of these offenses; by its terms, the section 7 definition is limited to title 18. Here, defendants were charged with violating title 21, sections 963 and 841(a)(1). The latter offenses need not occur within the special maritime and territorial jurisdiction of the United States as defined in 18 U.S.C. § 7 to constitute offenses against the United States. A sovereign may exercise jurisdiction over acts done outside its geographical jurisdiction which are intended to produce detrimental effects within it. We therefore conclude the district court had jurisdiction. *See United States v. Baker*, 609 F.2d 134 (5th Cir. 1980) (defendant, arrested beyond the three–mile territorial sea, properly convicted of possession of marijuana with intent to distribute); *United States v. Cadena*, 585 F.2d 1252, 1257 (5th Cir. 1978) (defendants arrested upon foreign ship on the high seas; court had jurisdiction to try defendants for conspiracy to import and conspiracy to distribute marijuana); *United States v. Winter*, 509 F.2d 975, 980–83 (5th Cir.), *cert. denied, sub nom. Parks v. United States*, 432 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975) (court had jurisdiction over defendants, arrested on the high seas, charged with conspiracy to import marijuana).

■ In a related vein, defendants argue that because the Great Mystery was owned by a Grand Cayman corporation, the Coast Guard was not authorized to board and search it. Defendants are incorrect. Vessels have the nationality of the nation whose flag they are entitled to fly, Convention on the High Seas, Sept. 30, 1962, art. 5, 13 U.S.T. 2312, 2315, T.I.A.S. No. 5200; H. Baer, *Admiralty Law of the Supreme Court* § 21–1 (1969), and are subject to that nation's jurisdiction when on the high seas, Convention on the High Seas, art. 6. Through registration a vessel acquires its nationality. *See id.*, art. 5. The Great Mystery, registered in Florida, was a domestic vessel and subject to the Coast Guard's authority.

### III. *THE LEGALITY OF THE BOARDING AND SEARCH*

■ Next, defendants argue that the search which uncovered the marijuana was unconstitutional and therefore the district court erred in failing to suppress its fruits. We disagree.

---

4. The case upon which defendants rely, *United States v. Ross*, 439 F.2d 1355 (9th Cir. 1971), *cert. denied*, 404 U.S. 1015, 92 S.Ct. 686, 30 L.Ed.2d 661 (1972), involved a conviction under section 113.

Section 89(a) of title 14 authorizes the Coast Guard to "make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas . . . ."[5] This statute specifically empowers commissioned, warrant and petty officers of the Coast Guard to board vessels at any time in order to "address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel" using "all necessary force to compel compliance." This court's decision in *United States v. Hilton*, 619 F.2d 127 (1st Cir. 1980), issued after oral argument in the instant case, upheld, against constitutional challenge, the Coast Guard's authority pursuant to section 89(a) to conduct safety and document inspections on American Flag vessels located in international waters. *See also United States v. Miller*, 589 F.2d 1117,

1125 n. 3 (1st Cir. 1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (warrantless safety and document checks of vessels are "undoubtedly constitutional").

We concluded in *Hilton* that "the limited [6] intrusion represented by a document and safety inspection on the high seas, even in the absence of a warrant or suspicion of wrongdoing, is reasonable under the fourth amendment." *Hilton*, at 131. To reach this conclusion, we identified the important governmental objectives served by document and safety checks–"safety, identification and proper registration of vessels flying our flag," at 133–and the absence of alternative means of achieving these objectives. Road blocks could not be set up in the ocean and in–port inspections would bypass those

---

**5.** 14 U.S.C. § 89(a) provides,

"(a) The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest as being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both shall be seized."

**6.** We emphasized the limited nature of an administrative search. "The exception does not authorize Coast Guard officers to explore a vessel beyond the search reasonably incident to

a safety and document inspection, and it assuredly does not give carte blanche to search private books, papers, or other effects or areas of a vessel not related to the purposes of such an inspection." *United States v. Hilton*, at 132 (1st Cir. 1980). Most of the areas subject to a safety inspection, such as the engine room, bilges, holds, are places where, we think, the crew of a vessel would have little if any expectation of privacy. *Compare United States v. Williams*, 617 F.2d 1063, 1084 (5th Cir. 1980) (en banc). *See also United States v. Harper*, 617 F.2d 35, 38 39 (4th Cir. 1980) (discussing limited privacy interest invaded in administrative search). Indeed, there may be a substantial question whether defendants, who appear to have been mere crew members, have standing to challenge the legality of this search and seizure which did not intrude upon their private living quarters. *See United States v. Salvucci*, ⋯ U.S. ⋅ ⋅ , 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980) abolishing the automatic standing of defendants charged with crimes of possession). As the *Salvucci* case was decided subsequent to oral argument in the instant case, the parties have not addressed the standing issue and neither do we. Because of the change wrought by *Salvucci* we do not think the issue could be decided on the present record, at least with respect to defendants Arra and Aschinger who did not testify at the motion to suppress hearing. (Defendant Pettit testified he was a mere deck hand who did not even know the identity of the vessel's owners.) Since we conclude *infra* that the search and seizure were valid, we need not remand for further consideration of standing.

American flag vessels which seldom called at United States ports. "While the Coast Guard is thus left with considerable discretion in deciding which vessels to stop," we conclude that "such discretion is virtually unavoidable in a scheme of regulation that depends on stops conducted at sea, far from courts and magistrates." At 133.

We rejected in *Hilton* the argument that a warrant is required to conduct an administrative document and safety inspection. Our rationale in *Hilton* was consistent with the Supreme Court's excusal of administrative warrants in situations where "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Camara v. Muncipal Court*, 387 U.S. 523, 533, 87 S.Ct. 1727, 1733, 18 L.Ed.2d 930 (1967); *United States v. Biswell*, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972). The mobility and numerosity of vessels, and the vastness of the sea, make it impossible to provide for issuance of administrative warrants, in advance, on a vessel—by—vessel basis. And the alternative, issuance of some kind of open—ended process prior to a cutter's departure on patrol, *see* 3 W. LaFave, *Search and Seizure* § 10.8(f), at 43–44 (Supp.1980), would seem to be largely a formalistic exercise.[7]

In the present case, the Coast Guard justified the stopping of the Great Mystery and the subsequent brief search which led to the discovery of the marijuana in a forward compartment, as falling within the scope of a proper document and safety search.[8] We think it clear that the Coast Guard, once on board, did not stray beyond the limits of a proper safety and document inspection. Here the bags of marijuana came into plain view while the forward compartment was being inspected to see if it was free from an unsafe accumulation of fuel, a condition specifically forbidden by

7. A further basis for our holding in *Hilton* was the fact that maritime searches and seizures have historically constituted an exception to the warrant requirement. At 132. In a recent comprehensive opinion, *United States v. Williams*, 617 F.2d 1063, 1079 1081 (5th Cir. May 12, 1980) (en banc), the Fifth Circuit traced the power to stop and search vessels without warrant to the same Congress that on September 25, 1789 proposed the Bill of Rights, including the fourth amendment. *See also United States v. Ramsey*, 431 U.S. 606, 616 17, 97 S.Ct. 1972, 1978 1979, 52 L.Ed.2d 617 (1977). Noting that even today there exists no statute that provides authority for the issuance of warrants covering activities on the high seas, the Fifth Circuit held that the warrant requirement of the fourth amendment, and the related concept of probable cause, were inapplicable to maritime searches and seizures. Rather, the fourth amendment was held to require only that such searches and seizures be reasonable -and the en banc court reiterated its earlier view that document and safety inspections undertaken without warrant and without any particularized suspicion were "reasonable" within the fourth amendment. *See also United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc), *modified on other grounds*, 612 F.2d 887 (1980). More extensive searches were, however, held to require the existence of "a reasonable suspi-

cion" that criminal activity was taking place on board.

8. We indicated in *Hilton* that, notwithstanding the sweep of 14 U.S.C. § 89(a), the Coast Guard could not constitutionally conduct a search more extensive than that which would be included within a proper document and safety search except by consent or where probable cause existed. At 131. As our *Hilton* opinion was issued before the en banc opinion in *United States v. Williams*, 617 F.2d 1063 (5th Cir. 1980), we did not then have before us the Fifth Circuit's *Williams* formulation which would allow the Coast Guard to board and search upon a "reasonable suspicion" standard in situations that do not fall within the document and safety rationale. The Fifth Circuit held that the more stringent standard of probable cause was not required in maritime cases. We need not here decide whether to adopt the Fifth Circuit's views in this regard, as the document and safety rationale amply covers the present situation. As discussed *infra* at 846–847, however, we think the factors known to the Coast Guard just before it boarded the Great Mystery can be said to have added up to a reasonable suspicion that the vessel was engaged in drug smuggling, although not to probable cause.

Coast Guard safety regulations promulgated under authority of the Federal Boat Safety Act of 1971, 46 U.S.C. § 1451, *et seq.*,[9] *see* 33 C.F.R. § 177.07 (1979), and thus this is not a case where the boarding officers failed to confine their inspection to those parts of the vessel in which the government has a legitimate safety regulatory interest. The cited regulation defines and enumerates unsafe conditions, among which are fuel leakage from either the fuel system or engine, 33 C.F.R. § 177.08(b), and an accumulation of fuel in the bilges or in a compartment other than a fuel tank, 33 C.F.R. § 177.07(c). It appears, from the boarding form placed in evidence, and from other evidence, to be standard Coast Guard practice when boarding a vessel to check for fuel leaks and accumulations.[10] Insofar as the record shows, the forward compartment, where the marijuana was discovered, was a logical place to examine for an unsafe fuel accumulation; Petty Officer Johnson testified he routinely made such examinations in the course of an administrative inspection.

Thus we find nothing objectionable in the manner in which the document and safety

**9.** The Federal Boat Safety Act of 1971 applies to

> "vessels . . . on waters subject to the jurisdiction of the United States and *on the high seas* beyond the territorial seas for *vessels owned in the United States.*" (Emphasis added.)

46 U.S.C. § 1453(a). The Great Mystery, while an American flag vessel registered in Florida, was owned by a Grand Cayman corporation. However, we think a domestically registered vessel is owned "in" the United States and hence covered by the Federal Boat Safety Act regardless of the citizenship of the vessel's owner. Once a vessel, through registration, subjects itself to the authority of a state and hence of the United States, that vessel is "owned in the United States" within the meaning of 46 U.S.C. § 1453(a).

The Department of the Navy, in commenting on the proposed Federal Boat Safety Act, recognized the imprecision of the term "owned in the United States":

> "[S]ection 4(a) of the bill [46 U.S.C. § 1453(a)] states that the bill will apply to areas beyond the territorial sea of the United States 'for . . . vessels owned in the United States.' This phrase could be misinterpreted as extending provisions of the bill to U.S. beneficially owned vessels which fly foreign flags. A review of the substantive portions of the bill negates any intention to apply it in this fashion. In light of this fact, and the use of the quoted term in past similar legislation applicable to motorboat safety, the Department of Defense does not object to the continued use of the language. However, it is strongly suggested that it be made clear in consideration of this bill that it is not intended to be applied on the high seas to foreign flag vessels."

[1971] U.S.Code Cong. & Admin.News, pp. 1333, 1361. As noted by the Navy, similar "owned in" language was employed in former legislation. Section 3(a) of the Federal Boating Act of 1958, Pub.L.No.85 ·911, 72 Stat. 1754 (1958), required "[e]very undocumented vessel propelled by machinery of more than 10 horsepower . . . using the navigable water of the United States, its Territories and the District of Columbia, and every such vessel *owned in a State* and using the high seas" to "be numbered in accordance with [the] Act," with certain enumerated exceptions. (Emphasis added.)

The hypothetical posed by the Navy–domestic ownership of a vessel registered in another country· is the converse of the present situation domestic registry of a foreign owned vessel. Since it is through the act of registration that authority is asserted over a vessel, *see* Convention on the High Seas, Sept. 30, 1962, art. 5, 13 U.S.T. 2312, 2315, T.I.A.S. No. 5200, it would be anomalous for a domestically registered vessel to escape regulation because owned by a foreign citizen or corporation. Moreover, the safety objectives of the 1971 Act would be circumvented if by the mere expediency of transferring ownership to a foreign corporation, the domestically· registered boat could then avoid the strictures of the Act, at least while operating on the high seas. We do not believe Congress intended to create such a loophole, and we therefore interpret "owned in the United States" to include vessels such as the Great Mystery registered under state law.

**10.** The form which the boarding officer used as a checklist and undertook to complete is printed below. It is known as CG 4100 (Rev. 1–76).

# REPORT OF BOARDING

REPORT NUMBER: 5C6-034

| VESSEL NUMBER | VESSEL NAME | HIN |
|---|---|---|
| FL 9685-CA | GREAT MYSTERY | N/A |

**VESSEL DATA**

FUEL COMPARTMENT
- ☐ Open
- ☑ Closed

ENGINE COMPARTMENT
- ☐ Open
- ☑ Closed

| MAKE | MODEL | MODEL YEAR | HULL MATERIAL | POB |
|---|---|---|---|---|
| SWEDISH Built Yacht | | 1938 | STEEL | 4 |

NET TONS: 55  LENGTH: 71

CONSTRUCTION: ☐ Open  ☑ Closed    HF 360

MAIN PROPULSION· ☑ IB ☐ OB ☐ Other ___
FUEL. ☐ Gas ☑ Oil ☐ Other ___

USE ☑ Pleasure  ☐ Passenger  ☐ Commercial

OWNER NAME AND ADDRESS (First, Middle Int Last) ☐ Mr ☐ Mrs ☐ Miss ☐ Ms

CARIBBEAN DIVERSIFIED Concepts LTD.
The Thompson BLDG
GEORGETOWN GRAND CAYMAN

☐ Owner Onboard    Zip·

OPERATOR NAME AND ADDRESS (First Middle Int, Last) ☐ Mr ☐ Mrs ☐ Miss ☐ Ms

PAUL OLIVER KELLER
2211 ERNEST ST    DOB 9-10-43    Age, if under 18
☐ Same as owner  JACKSONVILLE FLORIDA    Zip· 32204

| OBSERVED IN USE | DATE | TIME | ZONE | BODY OF WATER | DETAILED LOCATION |
|---|---|---|---|---|---|
| | 5 JAN 78 | 11:00 PM | AST | ATLANTIC | 19°00'N 67°37'W |

CITY AND STATE: N/A

| ✓ | | VIOLATION | CITATION | ✓ | | UNSAFE CONDITION | CITATION |
|---|---|---|---|---|---|---|---|
| | 1 | NUMBERING | 33 CFR 173 | | 12 | UNSAFE CONDITIONS NOTED IN VIOLATION SECTION | 33 CFR 177 07 |
| | 2 | PERSONAL FLOTATION DEVICE | 33 CFR 175/46 CFR 25 | | 13 | OVERLOADED | 46 USC 1462 |
| | 3 | SOUND PRODUCING DEVICE | 46 CFR 25.05 | | 14 | ACCUMULATION OF FUEL IN BILGES | 33 CFR 177 07 |
| | 4 | BELL | 46 CFR 25 05 | | 15 | FUEL LEAK—ENGINE OR FUEL SYSTEM | 33 CFR 177 07 |
| | 5 | FIRE EXTINGUISHERS | 46 CFR 25 30 | | 16 | MANIFESTLY UNSAFE VOYAGE | 33 CFR 177 07 |
| | 6 | FLAME ARRESTOR | 46 CFR 25 35 | | 17 | HAZARDOUS BARS (13TH DIST ONLY) | 33 CFR 177 07 |
| | 7 | VENTILATION | 46 CFR 25 40 | | | UNSAFE CONDITIONS CREATING ESPECIALLY HAZARDOUS CONDITIONS | |
| | 8 | NAVIGATION LIGHTS | 46 CFR 25.05 | | | CORRECTED ON THE SPOT | |
| | 9 | NEGLIGENT OPERATION | 46 USC 1461(d) | | | TERMINATED USE UNTIL CORRECTED (46 USC 1462) | |
| | 10 | FAILURE TO TERMINATE | 33 CFR 177 05 | | | WARNING ISSUED (SEE REVERSE) | |
| | 11 | OTHER | | | | NO VIOLATION OR UNSAFE CONDITIONS | |

REMARKS· (Continue on Reverse and Extra Sheets if Necessary)

GOVERNMENT EXHIBIT 4

BOARDING OFFICERS SIGNATURE    UNIT

BOARDING OFFICERS NAME (PRINT)    RANK, RATE

DEPARTMENT OF TRANSPORTATION   UNITED STATES COAST GUARD
CG 4100 (REV 1 76)
PREVIOUS EDITIONS MAY BE USED

**SEE REVERSE SIDE FOR ADDITIONAL INFORMATION**

check were conducted.[11] Appellants argue, however, that the document and safety check rationale fails because the real purpose of the search was to see if contraband was on board. Appellants point out that the Point Warde would never have intercepted the Great Mystery had the latter not first been detected by a helicopter and identified as a suspect marijuana smuggler on the basis of a list maintained by the government.[12] We may agree that the order to stop and board the Great Mystery was not stimulated by any primary concern over the condition of its safety gear and bilges, but we do not think the motivation for a particular boarding is relevant where, as here, an objective basis for conducting the document and safety check existed. We said in *Hilton*, at 131, that the "government's interests in being able to identify craft off the coasts are of major importance." [13] In the present instance, there was an initial question of the nationality of the Great Mystery because of its Florida registration and pur-

11. Defendants have argued that the inspection was somehow tainted by an excessive display of force on the Coast Guard's part. Four of the eight man crew of the 82 foot Point Warde were dispatched to board the Great Mystery, a vessel of nearly similar size, three of whom, all armed, actually boarded the vessel. There was testimony that the sea was very rough at the time, delaying the boarding operation and causing both small vessels to pitch and toss. We are in no position to say that the size of the boarding party or their display of arms was unreasonable. There were four men in the Great Mystery, and, for all the Coast Guard knew, there could have been more. Conceivably, the boarding party could have been taken hostage. These events occurred 35 miles from land, at night, on rough waters, and on the high seas. In view of the evidence that the Coast Guard, in its experience of conducting numerous document and safety checks, has encountered a criminal element, we cannot say precautionary measures of the type followed here are unwarranted. But even if we were to conclude excessive force was utilized, we would not suppress the fruits of the document and safety inspection. Cf. *United States v. Payner*, 444 U.S. 923, 100 S.Ct. 260, 62 L.Ed.2d 179 (1980) (noting exclusion of evidence is not required in every case of governmental illegality); *United States v. Crews*, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *State v. Sundberg*, 611 P.2d 44 (Alaska, 1980) (suppression of evidence is not appropriate remedy to deter use of excessive force by police in stopping fleeing suspect).

12. Ordinarily the legitimacy of a search is not dependent upon the searching officer's subjective intention the officer's suspicion that he might come across something for which he has not been authorized to search does not invalidate the search. *United States v. Baker*, 609 F.2d 134, 139 40 (5th Cir. 1980); *United States v. Hare*, 589 F.2d 1291 (6th Cir. 1979) (search warrant for firearms, drugs discovered; fact that officers suspected, but did not have probable cause to believe, drugs would be found does not invalidate an otherwise lawfully conducted search); *see also Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978) ("fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken so long as circumstances, viewed objectively, justify the action"); *cf. United States v. Mendenhall*, --- U.S. ---, --- n.6, 100 S.Ct. 1870, 1877 n.6, 64 L.Ed.2d 497 n.6 (1980) (subjective intent of officer irrelevant in determining whether seizure of person has occurred); *United States v. McCambridge*, 551 F.2d 865, 870 (1st Cir. 1977) (validity of arrest normally gauged by objective standard rather than by inquiry into officer's presumed motives); *United States v. Bugarin·Casas*, 484 F.2d 853 (9th Cir.), *cert. denied*, 414 U.S. 1136, 94 S.Ct. 881, 38 L.Ed.2d 762 (1974) (while agent may have relied on impermissible factor in stopping car, a requisite founded suspicion, viewed objectively, existed for stop); *but see Amador Gonzalez v. United States*, 391 F.2d 308, 314 15 (5th Cir. 1968); *Taglavore v. United States*, 291 F.2d 262, 265 (9th Cir. 1961).

The problem with defendant's approach is both the premium it would place on dissemblance and the difficulty of administering a standard which turns upon motivation. Motivation is a "self generating phenomenon." A. Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn.L.Rev. 349, 437 (1974). As law enforcement personnel learn that a particular motivation is improper because it will render an otherwise valid search invalid, they may not have difficulty convincing themselves that their conduct was prompted not by the improper reason but by the proper one, *see* discussion in 2 W. LaFave, *Search and Seizure* 284 85 (1978), and oftentimes it may be little more than guesswork for a court to determine what the true motivation was.

13. Unless the nationality and status of a vessel any vessel can be determined with assurance, those states, such as the United States, who are party to the Convention on the High Seas, September 30, 1962, 13 U.S.T. 2313, 2315, T.I.A.S. No. 5200, could never exercise the responsibilities each has agreed to assume. These responsibilities include "effectively exercis[ing] . . . jurisdiction and control in administrative, technical and social matters over ships flying its flag." *Id.*, art. 5. In particular, it would be absurd to hold that because

ported Grand Cayman corporate ownership. In addition, its hail port appeared to have been painted over, and it displayed no flag. These circumstances certainly provided a legitimate reason, if any were needed, to stop and board for a document check, *i. e.*, for the purpose of checking identity by inspecting papers, speaking to those on board, making sure that proper papers were being carried, and ascertaining that the vessel was in compliance with its documents. *Cf., e. g.*, 46 U.S.C. § 103, preventing pleasure yachts from carrying cargo or passengers for hire.

■ Once properly aboard, we think the Coast Guard could, in addition to checking the documents, complete a proper examination of those safety conditions and gear which under federal law and regulations are required to be maintained in a safe manner. It appears both from the boarding form placed in evidence, *see* note 10, and the testimony, to be routine Coast Guard practice, when boarding a vessel, to check documents, obtain basic identifying information, and conduct a safety check for compliance with items covered by the Federal Boat Safety Act and regulations. We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers. Moreover, the difficulty of applying a subjective standard would be monumental. *See* note 12. While the instant case maybe somewhat unusual in that a cutter was specially dispatched, document and safety inspections are routinely conducted by cutters on patrol, and, as is becoming apparent from the growing case law, contraband may be discovered in the course of these routine inspections. Ascertaining the real motivation or suspicions of the officer who orders any one of these numerous inspections would prove intractable. Thus, rather than looking into the minds of the officers, we will concentrate on their actions. If the search is limited in scope to checking documentation and inspecting safety equipment and conditions, it is valid.

Apart from our determination that the instant search is valid under the administrative document and safety inspection rationale, we observe that the district court, *see United States v. Keller*, 451 F.Supp. at 639–40, found that the Coast Guard had a reasonable suspicion, though not probable cause, to believe the Great Mystery was involved in smuggling. Under the *Williams* case just decided by the Fifth Circuit, the presence of a reasonable suspicion would, quite apart from the administrative search rationale just outlined, justify the boarding and search. While at the present time we are not ruling on whether or not to accept the *Williams'* rationale, we think it may be relevant to register our agreement with the district court that grounds for a reasonable suspicion did exist here. The factors we underline are as follows. First, there were indicia that the Great Mystery was seeking to conceal or at least obscure her identity. The vessel was flying no flag and her hailing port appeared to have been painted over. Second, the elderly 71–foot steel motor vessel, on her unexplained and mysterious "pleasure" mission, reported that Curacao had been her last port of call. Curacao is but a hundred or so miles from Colombia, the latter being well known as a drug source. Third, Great Mystery was on the government's list as a suspected drug smuggler.[14] Fourth, the vessel was first sighted 15 miles north of Arecibo, which is on the north central coast of Puerto Rico. A vessel en route from Curacao to either Florida or Nassau, as the Great Mystery purportedly was, would hardly traverse the northern coast of Puerto Rico which is considerably off any direct line of travel between the aforementioned points. Indeed, according to defendant Pettit's testimony, the Great

a member state believes a vessel to be a smuggler, it loses the capability of conducting an effective document search.

14. While it is true, as defendants point out, that there is no indication in the record how vessels get on the suspect list, similar internal govern-

mental listings when combined with other factors have provided the requisite cause for various searches and seizures. *See United States v. Rieves*, 584 F.2d 740 (5th Cir. 1978) (border strip search; person on Treasury computer list of suspected smugglers); *United States v. Kallevig*, 534 F.2d 411 (1st Cir. 1976).

Mystery on her voyage from Florida to Curacao had remained considerably west of Puerto Rico, travelling past the west coast of Haiti (Hispaniola) instead. The district court thus accurately described the Great Mystery as "hovering in the vicinity of United States territorial waters," 451 F.Supp. at 640, a characterization consistent with the Great Mystery's unexplained presence when first sighted 15 miles north of Arecibo, Puerto Rico. Thus, under the circumstances, the Coast Guard had reasonable cause for suspicion that the Great Mystery, on a list of vessels suspected of having engaged in smuggling, was so doing.

## IV. *DESTRUCTION OF EVIDENCE*

■ Apparently all communications monitored or participated in by Lt. Rummel were recorded. This would include transmissions from the surveilling helicopter to Lt. Rummel, Lt. Rummel's contacts with the operations center in Miami, the exchange between the Great Mystery and the Point Warde, and the Point Warde's transmissions to the Boarding party.[15] Defendants argue the government's destruction of these recordings prejudiced their ability to defend and denied them a fair trial. They contend the tape would have provided material from which to impeach the government witnesses and have established the following: (1) that the Great Mystery told the Coast Guard it was headed not for Florida but for Nassau and hence there is no basis for concluding defendants intended to bring the marijuana into the United States; (2) that no one on the Great Mystery ever stated the vessel was a United States vessel and hence the Coast Guard had no authority to board it; (3) that the purpose of the search was to locate marijuana as indicated by statements from the Point Warde asking whether "it" had been found yet.

Only the first point deserves serious consideration; establishment of (2) and (3) would not affect the outcome.[16] If the tape showed the Great Mystery as reporting it was destined for Nassau, the government would not be left without a case. The Great Mystery's location when sighted was 15 miles off the northern coast of Puerto Rico, a position inconsistent with a purported course from Curacao to Nassau, *see* discussion at 20. It was also established the vessel had left from Florida and that all its crew members were Americans. These factors would have supported a judgment that the drugs were headed either for Puerto Rico or another U.S. destination. Furthermore, the existence of marijuana in great quantity, on the vessel, was stipulated to. Still, it is conceivable, had the tape been as defendants represented, that the court would have acquitted defendants on the theory that importation into the United States had not been satisfactorily proven.

At the hearing on defendants' motion to suppress, defense counsel stated he first learned of the tape a few days after the defendants were arrested, and he informed the government within a few weeks that he wanted to listen to it. Defense counsel was told he would have it, and he and Mr. McCarthy, a Drug Enforcement Administration (DEA) agent, discussed four or five alternate methods of producing the tape. The United States Attorney stated he gave orders for the tape to be preserved; nonetheless, the tape was recorded over and erased.

The court concluded the erasure was the result of "a good faith administrative error . . . ." *United States v. Keller*, 451 F.Supp. at 633 n.3. The evidence was as follows.

---

15. Lt. Rummel testified he was unable to pick up the boarding party's side of the conversation. He listened to the tapes the following day, and, with that one exception, they were clear.

16. The government proved through the Florida registration that the Great Mystery was a domestic flag vessel, and we concluded, *see* Part II, that the vessel could therefore be subjected to a document and safety inspection under 14

U.S.C. § 89(a). Hence, the responses of the captain and crew concerning citizenship or nationality would not invalidate the boarding and search. Likewise, for the reasons stated in Part III, the search, confined in scope to that embraced by a legitimate document and safety check, was valid regardless of the motivation of the Coast Guard officers, and hence statements concerning it would be of little relevance.

According to Lt. Rummel, the San Juan operations and rescue coordination center has 31 tapes and a 20–channel tape recorder which runs 24 hours a day, recording the vast array of ship–to–shore traffic. At the end of 24 hours, that day's tape is placed on a shelf, and, after 31 days, the tape is placed back into service which results in the erasing of the previous recording. While Lt. Rummel, the duty officer, did not remember a specific order [17] to preserve the tape, he did realize the tape was important evidence and understood that Mr. McCarthy, a DEA agent, would be arriving within a few days to make a separate recording of the portions relating to the Great Mystery. He thought the tape had been set aside for this purpose, but apparently his chief radio officer put it back on the shelf. Lt. Rummel, who was not on duty every day, assumed the recording had been made on one of his off–duty days and took no measure to preserve the tape himself. The separate recording was not made, and, in due course, the tape was recorded over and erased.[18]

Defendants argue this destruction is about as close to outright bad faith as is likely to arise since a government witness will seldom, if ever, admit a deliberate destruction of evidence. While the government's handling of this important tape is not to be commended, the evidence, as the district court concluded, does not indicate an intentional erasure. The question, then, is whether this negligent bureaucratic mix–up deprived defendants of a fair trial. We conclude it did not.

In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 87, 83 S.Ct. at 1196, *see also United*

*States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976) ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor."). Standing alone, these cases would tend to indicate the government's good or bad faith is irrelevant to a determination whether a defendant's due process right was violated. That is not the case, however, for the Supreme Court differentiates between the suppression of evidence on the one hand and its loss on the other. The Court apparently does not consider evidence to have been suppressed in the *Brady* sense if the government satisfactorily explains why it is unable to produce the evidence. This is illustrated by *United States v. Augenblick*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). *See also Killian v. United States*, 368 U.S. 231, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

In *Augenblick*, the government had lost the tape of an interview with a key prosecution witness–the other participant in the indecent act for which defendant was court marshalled and discharged from the service. During the course of the interview, the witness at first apparently denied anything had happened and then maintained an act of sodomy had occurred. *Id.*, 393 U.S. 353, 89 S.Ct. 532. The defense theorized that the witness had been induced to change his story during the interview upon a promise that he would receive an honorable discharge. Indeed, the witness was honorably discharged after the defendant was convicted, despite his admission to participation in sodomy. Although government officials testified to the routine followed in handling tapes and the efforts to locate them, the reason for the tapes' loss was never ascertained. The court, noting that an "earnest effort" to locate the tapes had been made, *id.*, 355, 89 S.Ct. 533, and that the record was "devoid of credible evidence that

---

**17.** The United States Attorney stated he spoke with Commander Luppert, not Lt. Rummel, and told the former he wanted the tape preserved.

**18.** The government offered to have Agent McCarthy testify if the court wanted more

elaboration. The court responded that defendants had failed to establish an essential element--bad faith on the part of the government--and Agent McCarthy was never called to the stand.

they were suppressed," *id.*, 356, 89 S.Ct. 533, concluded defendant's due process right to a fair trial had not been denied by the tapes' nonproduction. While the defendant in *Augenblick* might have been aided had the tape enabled him to impeach the witness, it is clear from the evidence as recounted in the Court of Claims opinion, *Augenblick v. United States*, 377 F.2d 586 (Ct.Cl.1967), that the testimony of the arresting officers would have been sufficient alone to sustain the conviction, and hence the lost evidence was not crucial.

Thus, *Augenblick* indicates that the proper focus in a case of lost evidence as opposed to suppressed evidence is not solely on the potential prejudice to the defendant from the evidence's nonproduction as in *Brady* and *Agurs*, but also upon the government's culpability. Following *Augenblick*, this court stated that a "three–pronged examination" is to be made in order to ascertain whether a defendant's due process right has been prejudiced by the destruction of evidence. *United States v. Picariello*, 568 F.2d 222 (1st Cir. 1978). The following are to be considered.

"[F]irst, was the evidence material to the question of guilt or the degree of punishment; second, was defendant prejudiced by its destruction; and third, was the government acting in good faith when it destroyed the evidence."

*Id.*, 227.

We have no difficulty with the first. As stated earlier, the tape was potentially material. As for the third, we see no reason to reject the district court's finding that the loss was the result of a good faith administrative error. The tapes were made in the Coast Guard's operations and rescue coordination center, presumably not merely or even primarily for prosecutorial purposes but to preserve ship–to–shore communications with vessels, including those in distress. The erasure was made in accordance with routines which had no specific relation to this case.

The second factor, prejudice to defendants, is more troublesome. If the Great Mystery did respond, as Lt. Rummel and Commander Luppert testified, the erasure did not prejudice defendants, for the tape, corroborative of the testimony of government witnesses, would not have aided the defense. If, on the other hand, the Great Mystery's responses were as testified to by defendant Pettit, the government's version, especially the testimony as to a Florida destination, would have been undermined. While the district court, believing that bad faith was an essential and unproved element, did not make an explicit finding whether defendants had been prejudiced by the loss, it clearly rejected defendants' version of the content of the tape and hence implicitly concluded defendants were not prejudiced; the court's findings with respect to the communication between the Great Mystery and the Point Warde are essentially in accord with the government's evidence, not the defendants'. *United States v. Keller*, 451 F.Supp. 631, 633 (D.P. R.1978).

We do not think in a situation such as the present, where the government is guilty of negligent–but not intentional bad faith–destruction of evidence, that a defendant's rather improbable version of the substance or character of the lost evidence must be uncritically accepted and prejudice assessed as if the contents were as defendant claims. *See United States v. Miranda*, 526 F.2d 1319, 1328 (2d Cir. 1975), *cert. denied*, 429 U.S. 821, 97 S.Ct. 69, 50 L.Ed.2d 82 (1976) (more likely lost tape would have supported government's account than defendant's somewhat incredible version); *see also United States v. Rose*, 590 F.2d 232 (7th Cir. 1978), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979) (essentials of lost taped conversation fully confirmed by later events); *Government of Virgin Islands v. Testamark*, 570 F.2d 1162 (3d Cir. 1978) (conceivably negligently destroyed blood sample could have supported incompetent to form intent to rape defense, but defendant's own description of his actions unwaveringly pointed to competence). It may be, though we do not now so decide, that intentional, wrongful misconduct on the part of the government would warrant

an assumption that the evidence destroyed would have been favorable to the defense. *See*, Comment, "Judicial Response to Governmental Loss or Destruction of Evidence," 39 U.Chi.L.Rev. 542, 563 n. 122 (1972). Such an assumption is not required, we think, when evidence has been lost through negligence and when defendants' version lacks credibility.

Defendants' version of the Point Warde's questions and the Great Mystery's responses is highly suspect in an important respect. According to defendant Pettit, the Coast Guard asked not the nationality of the vessel, but the crew's citizenship. Since it is the vessel's nationality as determined by its registry which is central to the Coast Guard's authority to board and inspect, it is highly unlikely the Coast Guard sought to determine the crew's citizenship rather than the nationality of the Great Mystery. While defendants may have been confused as to the Coast Guard's authority to board and search a vessel, believing the vessel's ownership rather than its registry was the controlling factor (see defendants' argument addressed in Part II), the Coast Guard was not. According to Lt. Rummel, it was the Great Mystery's possible dual registry which resulted in the rescission of the original order to board. It is thus most probable the Coast Guard inquired of the Great Mystery its nationality or registry. Defendant Pettit's contrary statements, tailored to what he perceived to be the defendants' interest, reflect adversely on his credibility and thus tend to undermine his entire testimony, including that related to destination.

Under the circumstances, then, we think it highly unlikely that the contents of the tape were as defendants contend, and thus it seems improbable defendants were prejudiced by the tape's destruction; hence, we conclude defendants were not denied due process by the government's negligent destruction of the tape.

### V.

Defendants' last argument is difficult to fathom. They point to their lack of *Miranda* warnings prior to the discovery of the marijuana and claim that a certain statement defendant Pettit whispered to defendant Aschinger—to the effect that he was afraid the Coast Guard would shoot when they found "it"—was the product of coercion and hence inadmissible under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That statement, to which Pettit testified on direct examination by his counsel, was not introduced into evidence by the government and thus defendants have no cause for complaint.

*Affirmed.*