**UNITED STATES of America, (Plaintiff),**

v.

**Charles F. BURKE, Jr., and Alan Peter Quin, (Defendants).**

**Crim. No. 82–0063 (TR).**

United States District Court, D. Puerto Rico.

June 10, 1982.

---

**16.** *See also Budinsky v. Corning Glass Works,* 425 F.Supp. 786 (W.D.Pa.1977).

E. M. DeJesús, Hato Rey, P. R., for plaintiff.

Carlos García Gutiérrez, Santurce, P. R., for defendants.

## DECISION AND FINDINGS

TORRUELLA, District Judge.

The following constitutes the opinion of the Court on Defendants' "Motion to Suppress Evidence" as well as the findings pursuant to Rule 23(c) of the Federal Rules of Criminal Procedure.

Defendants are charged in a one count indictment in which it is alleged that "[o]n or about March 28, 1982, on the high seas and within the special maritime and territorial jurisdiction of the United States, that is, on board a vessel of the United States, the 'IRENE B.II' ", they aided and abetted each other in unlawfully, knowingly and intentionally possessing approximately 41,000 pounds of marijuana in violation of Sections 2, 7 and 9 of Title 18, and Section 955a of Title 21.[1]

---

1. 18 U.S.C. § 2 reads:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

The facts are as follows:

Some time during the day of March 27, 1982, a United States Coast Guard patrol airplane spotted a black and white shrimper-type vessel in the Caribbean Sea south of St. Thomas, United States Virgin Islands. The vessel was in international waters in a course heading of 055°T, in the general direction of the Island of Anguilla. The vessel was identified by the aircraft as the "JEANIE B." It was not flying a national flag nor could a home port be observed on its stern. Because of various intelligence reports, including monitored vessel radio communications, the Coast Guard concluded that the subject vessel was heading for a "rendezvous with something or someone near the area of Dog Island northwest of Anguilla to conduct possible illegal activity."[2] Late on March 27 the Coast Guard cutter WHITEHORN was dispatched from St. Thomas to intercept and board this vessel. Throughout the daylight hours of March 28 the WHITEHORN searched, without success, the Anegada Passage, which separates the Virgin Islands from the Leeward Islands, of which Anguilla is part.

At 2330 hours (11:30 P.M.) of March 28 the WHITEHORN was still patrolling in the Anegada Passage, approximately 30 miles west of Anguilla, in international waters. The executive officer, Edward Krejci, was in command at the bridge. A radar contact was made with a vessel[3] about 4 miles away, which could not be visually seen because it showed no lights. Krejci called the Captain to the bridge, Lt. J. E. DeJung, who proceeded to bring the WHITEHORN within 100 yards of the blacked-out vessel, at which point the WHITEHORN's searchlight revealed a black and white shrimper-type vessel, which DeJung first thought was named "JEANIE B.", but upon inspection by binoculars turned out to be the "IRENE B.II" (IRENE). In addition to no lights, this vessel showed no flag nor could a home port to be observed on its stern.[4] It appeared low in the water, as if with a full cargo. DeJung attempted to contact the IRENE's crew through the VHF FM radio, on both channels 16 and 26 without success. He then used a loud hailer, identifying the WHITEHORN as a United States Coast Guard vessel. The WHITEHORN is 82 feet in overall length and is painted white, except for diagonal red and blue stripes on both sides of the bow, where the black letters "C G" are also painted in black, 15 inches in height. At this point the vessels were within 50 yards from each other with

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

18 U.S.C. § 7, in its pertinent part reads: "The term 'special maritime and territorial jurisdiction of the United States', as used in this title, includes:
(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State."

18 U.S.C. § 9 reads: "The term 'vessel of the United States', as used in this title, means a vessel belonging in whole or in part to the United States, or any citizen thereof, or any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof."

21 U.S.C. § 955a(a) reads:
"It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance."

2. See page 3, Defendants' "Brief in Support of Motion to Suppress Evidence."

3. This was the fourth contact they had made. The other three had been two U.S. flag sailing vessels and the third a small west-bound wooden boat. All other vessels encountered had lights on.

4. As it turned out, the home port was covered by nets. It was Cape May, New Jersey. The IRENE is officially registered in Philadelphia, Pennsylvania, however.

the WHITEHORN astern of the IRENE, both vessels in approximately East-North-East headings, at about the same speed (10 knots). A 6 foot chop was running and the wind was at 15 knots from the East. Upon the IRENE's failure to make any response, the WHITEHORN energized its blue flashing light and siren, and ran up International Code Flags "Sierra" and "Papa" ("S P") on its signal mast,[5] and proceeded to illuminate those signals as well as the United States and Coast Guard ensigns, which were already flying. The spotlight was also intermittently flashed on the Coast Guard personnel on deck, who were uniformed and wore head gear.

The IRENE finally responded by proceeding to take evasive action. The WHITEHORN continued the actions previously described to no avail. This encounter lasted throughout the next 5 hours but was not entirely passive on either side. In addition to the evasive actions previously described, which consisted mostly of circular courses and abrupt changes in direction, the IRENE's crew attempted on two occasions to ram the WHITEHORN. The WHITEHORN in turn fired more than 90 rounds from a 50 caliber machine gun across the IRENE's bow in an attempt to get her to stop, to no avail. The WHITEHORN finally stopped her by towing a cable across her bow and fouling her screws.

The IRENE stopped dead in the water and started what eventually became a 10° list to port. They were still in international waters at Latitude 18° 11' North, Longitude 63° 29.5' West. Lt. De Jung eased the WHITEHORN's bow up to IRENE's stern and put a three-man boarding party on her, led by Krejci. While this was being done, one of the IRENE's crew stepped out of the pilot house and dumped overboard some plastic bags containing a white substance. The boarding party was in uniform (duck pants, light blue shirt and head gear) which clearly identified them as members of the Coast Guard, and were armed with one shot gun and side arms.

Krejci, who was the first aboard the IRENE and who had considerable experience in high seas boardings and drug-related seizures, smelled marijuana as he landed on the IRENE's deck. Two crew members who appeared were placed faced down on the deck of the IRENE's fantail, under armed observation by one of the coastguardsmen. Krejci and the other coastguardsman proceeded to search the IRENE for other crew and weapons, and to attempt to determine the cause of the IRENE's now pronounced list. They did a sweep of the forward hold and discovered it filled with burlap bales atop of which was scattered marijuana residue. The main hold was similarly occupied all the way up to the deck level. An incursion into the engine room revealed that one of the intake pipes had been shattered in an attempt to scuttle the IRENE, and that a considerable amount of water was coming into the hull. In the wheel house were observed a frequency scanner, a radar set, and a VHF radio set at Channel 26. The search of the IRENE produced no other crew members or weapons.

The crew of the IRENE turned out to be Defendants Charles F. Burke, Jr. and Alan Peter Quin. They produced ship's papers which revealed that the IRENE was an American flag vessel. A testing of the IRENE's cargo by Krejci, using a kit which is standard equipment for boarding parties, gave a positive reaction to marijuana, and he proceeded to place both Defendants under arrest. It was now 0615 (6:15 A.M.) of March 29th.

The IRENE was then towed to San Juan, Puerto Rico where it was determined that it carried 41,000 pounds of marijuana.

Defendants moved for the suppression of the evidence seized because of violation of their Fourth Amendment rights "when the Coast Guard boarded their ship and commenced search pursuant to ... 14 U.S.C. Section 89, there being no reasonable or

5. Which means "stop."

articulable suspicion of any safety hazards or navel (sic) regulatory infractions", also claiming that there was no probable cause to believe that any crime had been or was being committed. At the hearing Defendants also seemed to put at issue the validity of the extraterritorial application of 21 U.S.C. 955a.

In the light of the undisputed facts and the unanimous case law on these matters, Defendants' stance on these issues brings to mind what was stated by the Court in *United States v. Cordero*, 668 F.2d 32, 43 (CA 1, 1981): "While forceful advocacy is desirable, overstatement, by engendering mistrust, can work to the ultimate disadvantage of a client."

■ Even the courts have recognized what has been obvious from time immemorial to seafares: that ships are not the same as houses. *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); cf. *United States v. Ross*, — U.S. —, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In *Ross*, 102 S.Ct. at 2162, the Court "noted that historically warrantless searches of vessels . . .—as opposed to fixed premises such as a home or other building—had been considered *reasonable* by Congress." (Emphasis supplied). It is, of course, the word "reasonable" that is the key to Fourth Amendment issues in that it is only an *un* reasonable search that is proscribed by that Constitutional provision. Along this vein the Court in *Ross*, 102 S.Ct. at 2162–63, in quoting from *Carroll v. United States* says that:

. . . "[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the Government, as recognizing a necessary difference between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship [or] motorboat . . . where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

The bottom line is, that those who go down to the sea in ships have "a lesser expectation of privacy [in their ships] than in their homes, obviating the usual fourth amendment requirements of a warrant." *United States v. Green*, 671 F.2d 46, 53 (C.A. 1, 1982); *United States v. Hilton*, 619 F.2d 127, 131 (C.A. 1, 1980), cert. den. 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1980); *United States v. Arra*, 630 F.2d 836 (C.A. 1, 1980); *United States v. Williams*, 617 F.2d 1063 (C.A. 5, 1980) (en banc); *United States v. Hayes*, 479 F.Supp. 901, 907 (DCPR, 1979) rev. in part 653 F.2d 8 (C.A. 1, 1981).

The authority to stop and board American flag vessels on the high seas and to carry about searches and arrests incident thereto is provided by 14 U.S.C. § 89(a) which states that:

"The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested or, if escaping to shore, shall be immediately pursued and arrested on shore, or other lawful and appropriate action shall be taken; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise,

or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture, or so as to render such vessel liable to a fine or penalty and if necessary to secure such fine or penalty, such vessel or such merchandise, or both, shall be seized."

Under this statute, whose precursor dates back to 1790,[6] the Coast Guard may stop and board any American flag vessel on the high seas without any warrant, and without any particularized suspicion of wrongdoing, to conduct safety and document inspections. *United States v. Hayes*, 653 F.2d at pages 11–12; *United States v. Arra*, supra, at pages 841–846; *United States v. Hilton*, supra, at page 131. Such administrative actions come clearly within the rule in *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Of course, a more extensive search is permissible only if there is consent or probable cause to believe a crime has been or is being committed.

Defendants seek to invalidate the Coast Guard's actions because they allege that "Coast Guard officials unquestionably used the safety inspection as a subterfuge to conduct a search for evidence of a crime in the absence of any probable cause to believe that a crime had been or was being committed." Leaving for the moment the last part of this argument, Defendants point to no case in which the subjective mentality of the officer conducting an administrative inspection has been held to have any relevance to the reasonableness of his action. The rule, in fact, is otherwise. *United States v. Hayes*, supra, at page 12; *United States v. Arra*, supra, at pages 845–846. In *Arra* the Court said:

"... While the instant case may be somewhat unusual in that a cutter was specially dispatched, document and safety inspections are routinely conducted by cutters on patrol, and, as is becoming apparent from the growing case law, contraband may be discovered in the course of routine inspections. Ascertaining the real motivation or suspicions of the officer who orders any one of these numerous inspections would prove intractable. Thus, rather than looking into the minds of the officers, we will concentrate on their actions ..."

Just like unauthorized actions can not be legalized by the presence of pure motives, legal ones can not be invalidated by the lack of naiveté in the officer's innermost thoughts.

█ But the boarding and search of the IRENE need not rest solely on the premises of an administrative search pursuant to 14 U.S.C. § 89. As stated in *United States v. Green*, supra, at page 53:

"... [I]n addition to permitting proper administrative searches, the fourth amendment allows government officers, who are otherwise authorized, to board and search a vessel on the high seas should they have *reasonable and articulable grounds* for suspecting that it is engaged in criminal activity ..." (Emphasis supplied).

█ The facts of this case present us with grounds which are not only sufficiently reasonable and articulable as to permit the stopping and boarding of the IRENE, but which would also be sufficient to meet a probable cause standard, were such standard required in the present context by an abrupt change in the course of the law:

(1) The presence of a shrimper in an area where that type of vessel is highly unusual. (cf. *United States v. Hayes*, supra);

(2) Proceeding without lights (see 33 U.S.C. § 1608);

(3) Not flying a flag (cf. *United States v. Arra*, supra);

(4) Hiding the identity of her home port (*Id.*);

---

**6.** Act of August 4, 1790, c. 35, 1 Stat. 145, Section 48. See *United States v. Keller*, 451

F.Supp. 631, footnote 16 at page 639 (DCPR, 1978).

(5) Riding low in the water (cf. *United States v. Green*, supra);

(6) With an unusually large number of radio antenna, atypical of legitimate shrimpers, but typical of vessels used for drug smuggling; and

(7) Which not only failed to respond to numerous hails by voice and signal, but led a 5 hour evasive chase during which it attempted to ram the Coast Guard cutter (*Id.*).

Under those circumstances the Coast Guard not only acted reasonably but would have been derelict in its duty had it failed to stop and board the IRENE.

■ Once on board, there was addition cause for the Coast Guard to act upon and conduct a full search of the IRENE:

(1) The strong odor of marijuana (cf. *United States v. Hilton*, supra, at page 133);

(2) The burlap bags with marijuana residue on top (cf. *United States v. Shelnut*, 625 F.2d 59, 61 (C.A. 5, 1980) in the holds of the vessel, areas in which there is "no legitimate expectation of privacy in ... a shrimp boat" (see *United States v. Ricardo*, 619 F.2d 1124, 1130 (C.A. 5, 1980), and

(3) The list which became apparent in the IRENE shortly after she was stopped by the WHITEHORN's cable (cf. *United States v. Hicks*, 624 F.2d 32, 33 (C.A. 5, 1980)).

Defendants' contentions regarding the suppression thus stand on very wet ground. Their allegations against the extra-territorial application of 21 U.S.C. § 955a fare no better.

■ Extra-territorial application of penal laws is authorized by Article I, Section 8, Clause 10 of the Constitution, which authorizes Congress "to define and punish Piracies and Felonies committed on the high seas, and offenses against the Laws of Nations", and under Article III, Section 2, whereby the judiciary is invested with authority over "all cases of admiralty and maritime jurisdiction." In enacting 21 U.S.C. § 955a, Congress was not only proceeding within the authority granted by these provisions but also complying with international treaties subscribed to by practically all of the civilized nations of the World. See "Convention on the High Seas, 1958", 13 U.S.T. 2313. The plain language of this statute indicates that Congress intended its extra-territorial application:

"It is unlawful for any person ... on board a vessel subject to the jurisdiction of the United States *on the high seas*, to knowingly or intentionally ... possess with intent to distribute a controlled substance." (Emphasis supplied).

The validity of this statute and its obvious extra-territorial reach have been affirmed by the courts. See *United States v. Smith*, 680 F.2d 255 (C.A.1 1982).

Defendants' Motion to Suppress is thus DENIED.

The evidence established beyond a reasonable doubt that Defendants Charles F. Burke, Jr., and Alan Peter Quin, aiding and abetting each other, unlawfully possessed controlled substances aboard the IRENE, a vessel subject to the jurisdiction of the United States, with the intent to distribute the same. A judgment of GUILTY shall be entered against them in COUNT I of the Indictment.

IT IS SO ORDERED.